**In the Matter of the Application of the Liquidating Committee of PAPELERAS REUNIDAS, S.A., Petitioner.**

**Bankruptcy No. 185–50236–260.**

United States Bankruptcy Court, E.D. New York.

Nov. 3, 1988.

---

675 (1986), at 106 S.Ct. 3256.

**27.** *In re Jackson,* 90 B.R. 126 (Bkrtcy.E.D.Pa. 1988).

**28.** *Id.*

Haas, Greenstein, Hauser, Sims, Cohen & Gerstein, P.C., New York City by Noel W. Hauser, for petitioner.

Katten, Muchin & Zavis, Chicago, Ill. by Francis X. Grossi, Jr., and David K. Schmitt, Bruce H. Roswick, New York City, for Republic Tobacco, Inc., formerly Adams Apple Distribution Co.

Stanley R. Goodman, Garden City, for Bambu Sales, Inc.

## DECISION

CONRAD B. DUBERSTEIN, Chief Judge.

This ancillary proceeding under § 304 of the Bankruptcy Code was initiated by a liquidating committee ("liquidators") appointed in insolvency proceedings instituted and pending in Spain affecting the affairs of Papeleras Reunidas, S.A. ("Papeleras"), a Spanish corporation. The liquidators have invoked § 304 to prevent Republic Tobacco, Inc. ("Republic"), a major creditor of Papeleras located in the United States, from interfering with the liquidators' efforts to obtain the balance of the proceeds of their sale of Papeleras's trademarks to Bambu Sales, Inc., a New York Corporation which had purchased the same. The § 304 proceeding is opposed by Republic.[1]

Republic was formerly known as Adams Apple Distributing Company ("Adams"). Republic claims a lien on the trademarks and further contends that their sale by the liquidators to Bambu violated Adams rights in the trademarks and gave rise to a fraudulent conveyance void as to Adams, now Republic. As will be further demonstrated, the sale of the trademarks by the liquidators to Bambu occurred at a time when Adams was engaged in litigation against Papeleras in the United States District Court for the Northern District of Illinois, which eventually resulted in a judgment in Adams's favor in excess of $1.4 million arising out of breach of contract. Later Republic commenced an action against Bambu in the United States District Court of this District to set aside as a fraudulent conveyance the sale of the trademarks to Bambu. The action was assigned to Honorable Jack B. Weinstein, District Judge of this District. By reason of my familiarity with the interrelated issues involved, Judge Weinstein referred the fraudulent conveyance action to me to preside over and try, as well as to resolve the within § 304 proceedings and to determine the respective rights of the parties.

---

1. Section 304 governs cases filed in the bankruptcy courts that are ancillary to foreign proceedings. It enables a representative in the foreign proceedings to file a petition under this section in order to administer assets located in this country. A party in interest may controvert the petition.

This § 304 proceeding was initiated shortly after the aforesaid fraudulent conveyance action was commenced in this District. In accordance with the provisions of § 305(a), after notice and a hearing, I suspended the § 304 proceedings pending the determination of the fraudulent conveyance action.[2] I thereupon restored the § 304 proceeding from its state of suspension to the trial calendar and directed all parties to go forward in accordance with its provisions so as to enable me to pass upon the issues raised therein. Upon the entry of an order by this court in conformity with this decision, I will then try the issues raised in the fraudulent conveyance action.

After all parties had completed substantial discovery proceedings in accordance with the Federal Rules of Civil Procedure, I conducted a trial of the issues raised in the § 304 proceedings. Having heard all parties and upon careful consideration of the evidence presented, as well as expert testimony proffered by members of the Spanish bar versed in the Spanish insolvency laws who appeared at the request of the various parties, I conclude that the § 304 proceedings should be dismissed for the reasons hereinafter set forth.

## FACTS

Papeleras is currently in the final stages of liquidation pursuant to the laws of Spain. It was a large, publicly-owned corporation, located in the city of Alcoy, province of Alicante in Spain, with shares of stock traded on the Spanish stock exchanges. It produced various paper products which were sold worldwide, including the Papeleras "Bambu" cigarette rolling papers ("Papeleras papers"). The trademarks relating to the Papeleras papers were registered in many countries, including the United States.

Prior to 1975 many distributors sold the Papeleras papers in the United States. On January 12, 1975, Adams, a Chicago based corporation, and Papeleras entered into a contract which designated Adams as the exclusive distributor of the Papeleras papers in the United States for five years.

A number of contractual disputes arose during the first year of the contract. By early 1976 both parties had ceased performance, each claiming the other had breached the contract. Papeleras then entered into a distribution contract directly with Bambu covering the United States.

On September 19, 1976, Adams filed a diversity suit against Papeleras in the United States District Court for the Northern District of Illinois for damages stemming from Papeleras's alleged breach of the contract and failure to pay contractual rebates. Papeleras counterclaimed seeking payment for a shipment of Papeleras papers to Adams. Ultimately a judgment was rendered in favor or Adams whereunder it was awarded damages arising out of the breach of contract. On July 13, 1981 District Judge Getzendanner in the Illinois action signed an order allowing Adams a trial on the issue of consequential damages. After a trial on the merits, Judge Getzendanner entered judgment for Adams's consequential damages on August 8, 1984, which was affirmed by the Seventh Circuit Court of Appeals on November 7, 1985.[3] The judgment, amounting to $1,450,973, made Adams the largest creditor of Papeleras.

After the commencement of the Illinois action and before any decision had been reached, a financial crisis arose among the Spanish paper companies. On November 7, 1979 the Papeleras board of directors, pursuant to authorization granted it by its shareholders, and in order to avail itself of a legal means of settling its debts, petitioned the Spanish court in Alcoy to accept its application for Suspension of Payments.[4]

---

**2.** Section 305 deals with abstention and provides that the court, after notice and a hearing, may dismiss a case under title 11 or may suspend all proceedings in the case under conditions more particularly set forth in the section.

**3.** *Adams Apple Distributing Company v. Papeleras Reunidas, S.A.,* No. 77 C 868, mem. op. (N.D. Ill., October 26, 1984), *aff'd* 773 F.2d 925 (7th Cir., November 7, 1985).

**4.** The Spanish "bankruptcy" proceeding originates from the Spanish Suspension of Payments

Only an entity whose assets are greater than its liabilities may file such an application. If the liabilities exceed the assets, it is then precluded from being in Suspension of Payments and its only recourse is liquidation.[5] On November 20, 1980 the Spanish court found that Papeleras's application satisfied the requirements and declared that Papeleras was in Suspension of Payments.

According to expert testimony heard in this court, notice of the Suspension of Payments to creditors is given in a manner as the Spanish judge "deems convenient." In this case, notice was placed in the official regional newspaper where Papeleras was located and in the official newspaper for all of Spain.

Notice was also sent to all Papeleras shareholders. Even though Adams and its President purchased shares of the Papeleras stock, as they had agreed pursuant to the distribution contract, it was stipulated in the trial before me that neither received notice of Papeleras's status as a debtor in the Suspension of Payments proceeding nor in subsequent Spanish liquidation proceedings which followed.[6]

On November 20, 1981 the Spanish court approved a plan of payment previously agreed upon between Papeleras and the majority of listed creditors.[7] Adams was not a listed creditor.

The plan provided that in the event Papeleras failed to make payments in accordance with its terms, Papeleras would be liquidated. With such a plan in effect, Papeleras continued to operate its business but under the supervision of three "interventors" or "receivers," delegates of the Spanish judge. Two of the three interventors were selected from a list in the possession of the Spanish court and became members of the creditors' committee in the Spanish proceeding.[8] The third interventor, usually the largest of the creditors, was also selected by the Spanish judge.[9]

Papeleras failed to make its second scheduled payment to creditors in late 1983 under its Suspension of Payments plan. It ceased operations in March 1984. Pursuant to the terms of the plan, the Spanish court directed that Papeleras be liquidated. On March 16, 1984 the Spanish court appointed the three Papeleras interventors as the liquidators.

Act of July 26, 1922, as contained in the Official Gazette No. 257, Sept. 14, 1922.

5. There are additional requirements to be contained in the Suspension of Payments application to the Spanish Court. According to the Suspension of Payments Act, the following are some of the data required to accompany the application: the entity's balance sheet or a statement of assets when the application is submitted unless a balance sheet is submitted within 30 days; title deeds of the properties; a list of all creditors, including their addresses, amounts due, origin of debts and the dates and maturity of each debt, unless the creditors number over 1000 or it is not possible to determine the amount of the debt in which case the applicant may estimate the number of creditors; the total amount of debts; a report explaining the causes for seeking the Suspension of Payments relief; the available means and a proposal to settle the debts; a document from the board of directors authorizing the submission of the application; a document that the shareholders met in accordance with the entity's bylaws and ratified the submission of the application; and those that will represent the applicant. *See generally Creditors' Rights Under Spanish Law*, 38 Am.J.Comp.

L. 259, 260 (1985) (hereinafter *Spanish Creditors'*).

6. Adams did not become aware of Papeleras's Suspension of Payments status until Papeleras's counsel informed Adams's counsel in August of 1984 in the Illinois District Court action.

7. *See generally Spanish Creditors', supra* note 5, at 264–65.

8. According to the Suspension of Payments Act and expert testimony, the Spanish court's list of potential interventors is compiled by the Spanish Chamber of Commerce equivalent and by industry and regional representatives of the Spanish banking association. *See Spanish Creditors', supra* note 5 at 260 n. 10.

9. Adams argues that if it had been recognized as a creditor at that time, it would have been Papeleras's largest creditor and thus would have likely been appointed as the third interventor. However, its consequential damages which provided it with a claim in excess of 1.4 million dollars had not been determined by the District Court in Illinois until 1984, four years after the Spanish Judge had accepted Papeleras's Suspension of Payments application.

Thereafter, and shortly after Adams recovered its breach of contract judgment in August of 1984, Papeleras appealed to the Seventh Circuit. Upon learning of the Spanish liquidation proceeding, Adams moved before the District Court in Illinois in October of 1984 to impose a lien on the Papeleras trademarks registered in the United States in lieu of a supersedeas appeal bond. Papeleras' liquidators opposed the motion on the ground that under Spanish law, creditors are not permitted to seize the assets of a company in liquidation to satisfy their claims. The liquidators' Spanish attorney, Salvador Vilar, joined in opposing the motion. The affidavit further stated that "no sale [of the trademarks] is planned." Relying on the affidavit, the District Court granted Adams' motion to impose a lien on the trademarks. It further stated that it would set aside the lien if Papeleras provided the court with certified English translations of Spanish law which showed a conflict with imposing the lien on the trademarks and if Adams' status as a creditor was recognized in Spain. The Spanish law referred to by Vilar was never provided the court and thus the lien continued.[10]

Notwithstanding the representation made by the liquidators' attorney, Vilar, that no sale of the trademarks was planned, the liquidators sold the trademarks to Bambu in Madrid on October 9, 1984, while the motion for the lien was pending. It is to be recalled that it was with Bambu that Papeleras had previously entered into a contract to provide exclusive distribution rights in the United States, after Paperleras's contractual problems arose with Adams. Testimony before this court relating to the transfer of the trademarks reveals that the liquidators and Bambu had negotiated for the transfer since March of 1984. Prior to the October 9, 1984 transfer, the liquidators approved the sale of the trademarks provided that more than their book value was received. There was further testimony to the effect that the contract with Bambu was drafted in Madrid immediately prior to the sale.

The terms of the sale provided that Bambu would pay the liquidators $1,500,000 for the trademarks of which $200,000 was payable within 5 days from the execution of the contract, subject to the approval by the Spanish authorities and the liquidators, and the subsequent registration of the trademarks in the United States. Bambu was then required to pay $400,000 over two years, with the remainder of $900,000 to be paid over a period of time. There is no question that Bambu was aware of Adams' lawsuit because the terms of sale included a provision that in the event Adams was successful in its action before the $900,000 became due, Bambu was required to pay it to Adams and be credited accordingly. Three days after the sale, Bambu's counsel presented and recorded the assignment of trademarks in the United States Patent and Trademark Office in Washington, D.C.

Adams first learned of the transfer of the trademarks and the fact that they no longer constituted trademarks belonging to Papeleras when it attempted to record its lien. Thus, Adam's court-ordered lien was never recorded.

On December 7, 1984 Adams filed suit against the New York corporation, Bambu, also in the United States District Court for the Northern District of Illinois, alleging that the transfer of the trademarks by Papeleras's liquidators to Bambu constituted a fraudulent conveyance. Thereafter on March 22, 1985, for venue reasons, Adams and Bambu stipulated to the dismissal of the lawsuit without prejudice. Prior to the

---

**10.** In addition to the belief that there would not be a sale of the trademarks, the District Court provided other reasons for granting the lien, namely that Vilar, by affidavit, failed to show: (1) that Spanish law would recognize Adams as a creditor in the Spanish proceeding, (2) the prejudice to Adams if Papeleras did not post a supersedeas bond, (3) the Spanish equivalent of the automatic stay and (4) that Vilar was a disinterested legal expert on Spanish law. The District Court also noted that Adams would not execute on the lien pending the appeal. *See* the reference to the District Court's opinion (*Adams Apple Distributing Company v. Papeleras Reunidas, S.A.*, No. 77 C 868, mem. op., N.D.Ill., October 26, 1984) in the decision of the Seventh Circuit Court of Appeals which affirmed the judgment of the District Court and the lien. 773 F.2d 925 (7th Cir., November 7, 1985).

dismissal of the Illinois lawsuit, Adams filed an identical fraudulent conveyance action against Bambu, in the United States District Court for the Eastern District of New York which, as has been noted was assigned to Honorable Jack B. Weinstein who in turn referred it to me for trial.

On February 20, 1985, the liquidators commenced the within ancillary proceeding pursuant to 11 U.S.C. § 304, to prevent Adams from seizing and garnishing the balance of the payments due Papeleras from Bambu for the transfer of the trademarks. An amended petition for the same relief was filed on March 1, 1985.

On March 15, 1985 Adams filed a certified copy of its Illinois judgment against Papeleras in the appropriate filing office in the State of New York. A restraining notice was served on Bambu, preventing it from assigning the trademarks or making further payments to Papeleras. Adams was not stayed from taking those steps by § 362(a) of the Bankruptcy Code which is applicable to petitions for bankruptcy relief under §§ 301–303. An ancillary proceeding as the instant one is governed by § 304.

On November 7, 1985, the Seventh Circuit Court of Appeals affirmed the jury verdict and Judge Getzendanner's consequential damages award and decision allowing Adams to impose a lien on the trademarks.[11]

As has also been noted, when I suspended without prejudice the § 304 proceedings in light of the aforementioned fraudulent conveyance action, I restored it to the calendar in conformity with Judge Weinstein's direction to have me proceed with it in addition to the trial of the fraudulent conveyance action.

On December 9, 1985 Adams and Bambu stipulated that until the determination of the issues between them, payments due to Papeleras from Bambu would be deposited in an interest bearing escrow account.

The present status of the Spanish liquidation is that most of the Papeleras assets have been liquidated.[12]

Thus few funds remain, excluding the trademarks' proceeds, to be applied to the payment of approximately $20,000,000 in claims filed by creditors of Papeleras.

## DISCUSSION

### I. Section 304(c) Considerations

■ American courts have long recognized the particular need to extend comity to foreign proceedings and the interrelationship between competing interests of debtors and representatives of their creditors here and abroad. "Congress implemented this policy by enacting section 304 as part of the Bankruptcy Reform Act of 1978." *Victrix Steamship Co., S.A. v. Salen Dry Cargo, A.B.*, 825 F.2d 709, 713–14 (2d Cir.1987).

Section 304(c) provides guidelines for determining the appropriate relief where United States ancillary proceedings relate to foreign proceedings. The section provides:

[T]he court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

---

**11.** *See* note 10, *supra.*

**12.** The legal advisor to the liquidators surmised in deposition testimony taken in this court in September 1986 that only about $20,000 to $30,000 of the assets remain to be liquidated and that little money has been brought into the estate because most of the assets were heavily

mortgaged. Presumably, Spanish Judges are not empowered to sell property free and clear of liens as United States Bankruptcy Judges may do under § 363(f) of the Bankruptcy Code. The secured creditors took possession of Papeleras's properties.

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

The determination of the appropriate relief depends upon the collective degree to which the criteria of § 304(c) are satisfied. *See Drexel Burnham Lambert Group Inc. v. Galadari*, 777 F.2d 877 (2d Cir.1985) ("[t]he court must decide whether to grant relief on the basis of the factors enumerated in section 304(c)"), and the case law precedent associated with the foreign country.[13]

### A. § 304(c)(1): Just Treatment of all Holders of Claims Against or Interests in Such Estate

■ From the evidence presented and testimony heard, Spanish bankruptcy law does not overtly discriminate against non-Spanish creditors of the debtor. However, Adams is not a recognized creditor of Papeleras in its proceedings. Spanish law recognizes only "constitutive" or liquidated, undisputed claims. When a claim is disputed, according to Spanish law, it is not recognized until rendered undisputed. Disputed claims include those matters pending appeal as provided for by the Spanish Suspension Payments Act.

When the Spanish court approved Papeleras's Suspension of Payments application in November 1980, the lawsuit in the Illinois District Court had not as yet been heard although it had been commenced. Papeleras's liability to Adams was unrecognized, pursuant to Spanish law, until the Seventh Circuit Court of Appeals affirmed Judge Getzendanner's orders on November 7, 1985.[14] By that time, most of the Papeleras assets had been liquidated.

There is nothing to suggest that "claim" in § 304(c)(1) differs from the broad definition of "claim" of § 101(4), which includes unliquidated and disputed claims.[15] Inasmuch as Spanish law did not recognize Adams' disputed, unliquidated claim in 1980 and 1984, the Spanish proceedings do not treat Adams as a holder of a claim which it would be entitled to if the bankruptcy case were pending in this country.

Deferring to the Spanish proceeding does not afford just treatment to Adams, thus suggesting that this court should dismiss the ancillary proceeding.

### B. § 304(c)(2): Protection of Claim Holders in the United States Against Prejudice and Inconvenience in Processing Claims in the Foreign Proceeding

By reason of its not having been given notice of the Spanish proceeding, Adams was not recognized as a creditor, thus depriving it of the opportunity to participate in the proceeding, prejudicial to its rights.

**13.** Research indicates that this court may be the first to consider Spanish law with respect to § 304 of the Bankruptcy Code. In *Danziger v. Banco Urquijo S.A. (In re Roscar Steel Scrap & Metals Corp.)*, No. 77 B 410, slip op. (Bkrtcy.S.D. N.Y., June 18, 1980), *aff'd* 12 B.R. 629 (S.D.N.Y. 1981), the courts examined the Spanish Suspension of Payments law as dealt with by § 2(a)(22) of the Bankruptcy Act, the predecessor to the present Bankruptcy Code. Section 304 of the Code significantly varies from § 2(a)(22) of the Act. *See generally In re Axona Int'l Credit & Commerce Ltd.*, 88 B.R. 597 (Bkrtcy.S.D.N.Y. 1988).

**14.** The experts of Spanish law who testified before this court stated that there are several ways to add a creditor. The putative creditor may petition the creditors' committee. If that fails then the creditor may initiate a lawsuit in Spain which may take from two to five years to resolve. Since the Seventh Circuit Court of Appeals decision of November 7, 1985, Adams has not petitioned the creditors' committee to be added to the list of creditors. The creditors' committee may also add a creditor without a petition from the putative creditor. The creditors' committee has not added Adams as a creditor. The potential unfairness of the Spanish Suspension of Payments proceeding in allowing "disinterested" creditors to objectively determine whether an alleged creditor should be added as an additional creditor of the debtor, thereby diluting the present creditors' return, was alluded to in *Danziger, supra* note 13.

**15.** 11 U.S.C. § 101(4) defines "claim" as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, *unliquidated*, fixed, contingent, matured, unmatured, *disputed*, undisputed, legal, equitable, secured or unsecured ...
(Emphasis added).

See *In re Culmer*, 25 B.R. 621, 630, 9 B.C.D. 1283 (Bkrtcy.S.D.N.Y.1982); *cf. Remington Rand Corporation–Delaware v. Business Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir.1987) (foreign order not recognized where person not provided with notice or an opportunity to be heard); *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 443 (3d Cir.1971) (foreign default judgment not recognized unless the person affected was given notice and opportunity to be heard in foreign proceeding), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972). This prejudicial lack of notice is a further reason for this court to dismiss the ancillary proceeding.

Furthermore, by providing Adams with a lien, the Illinois District Court, and by affirming its decision, the Seventh Circuit Court of Appeals as well, intended to provide Adams with protection against prejudice in the Spanish proceeding. The Seventh Circuit so stated clearly when it held:

> Moreover, the district court imposed the lien merely to protect Adams Apple's status as a creditor before the Spanish bankruptcy court, not to give Adams Apple a more favorable position than other creditors, which Papeleras contends is impermissible under Spanish law, or to otherwise interfere with the Spanish bankruptcy court's distribution of assets to Papeleras's creditors. The district court's only concern was that Papeleras's appeal to this court would prevent Adams Apple's claim from being considered by the Spanish court. The district court stated, however, that if Papeleras provided the court with certified translations of Spanish law showing a conflict between Spanish law and the court's order and showed that the Spanish court considered Adams Apple a creditor, it would vacate its lien order. The record indicates that no such showing was made. We therefore find that the district court properly balanced deference for the proceedings of the Spanish

bankruptcy court with the need to prevent prejudice to Adams Apple's rights as a creditor.

*Adams Apple*, 773 F.2d at 931, 932.

For the reasons stated, providing Papeleras with the benefits of § 304 deprives Adams of protection against prejudice and inconvenience in the Spanish proceeding, which 304(c)(2) is dedicated to preserve for the benefit of a claim holder in the United States.

C. *§ 304(c)(3): Prevention of Preferential or Fraudulent Dispositions of Property of the Estate*

1. *Preferential Dispositions of Property*

■ Testimony was presented that Spanish law disallows preferential transfers. As discussed *infra*, Spanish law classifies judgment lien creditors as general unsecured creditors while United States law generally classifies such lien creditors as secured creditors up to the value of the properties to which the liens attach in accordance with the provisions of § 506(a).[16] The liquidators argue that if this court were to permit Adams to satisfy its judgment from the trademarks or proceeds, such act would constitute preferential treatment in favor of Adams since it is unlikely that the other creditors will participate in any distribution.

Nowhere in the legislative history of the Bankruptcy Code did the drafters of § 304, as well as § 547 dealing with preferences, note that the treatment of various types of claims under the Bankruptcy Code may give rise to the equivalent of preferential transfers if contrary to a foreign country's laws. Although § 304(c)(3) is aimed at preventing, *inter alia*, the preferential disposition of the foreign estate's property here, a preference would certainly occur in favor of all the other creditors if this court were to permit the Spanish court to distribute the proceeds of the trademarks to them, to the exclusion of Adams. This is another

---

**16.** § 506(a) provides in pertinent part as follows:

"An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest...."

reason for this court to dismiss the ancillary proceeding.

### 2. *Fraudulent Disposition of Property*

The court is not called upon at this time, nor has it been presented with evidence, to adjudicate whether the sale of the trademarks by the liquidators to Bambu constituted a fraudulent conveyance. That will come shortly when it proceeds with the trial of the fraudulent conveyance action.

Insofar as the fraudulent disposition of the property of the foreign estate is concerned as it relates to § 304(c)(3), this court must consider whether Adams' efforts to satisfy its judgment by looking to the trademarks or their proceeds would constitute a fraudulent disposition of Papeleras's property in violation of the intent of § 304(c)(3).

In § 304 ancillary cases, where little has transpired in the foreign insolvency proceeding, the applicable foreign law prohibiting fraudulent transfers will generally be one reason why the foreign jurisdiction should administer the debtor's international bankruptcy as well as the disposition of its assets. *Universal Casualty & Surety Co. v. Gee (In re Gee)*, 53 B.R. 891, 904, 13 B.C.D. 757, 765 (Bkrtcy.S.D.N.Y.1985); *In re Culmer*, 25 B.R. at 630, 9 B.C.D. at 1288.

However, in cases such as this, where both parties have taken significant steps over many years to protect their interests, and the foreign proceedings in particular have all but been consummated, the parties' acts consistent with the foreign law should be examined to determine whether the disposition of the property here should be prevented by deferring to the foreign country.

It is to be noted that under the jurisdiction of the Spanish court, the principal free assets of the Papeleras estate, the trademarks, were sold without appropriate notice to the creditors, without approval of the Spanish court, and without notice to interested international buyers. During the trial before this court, testimony was elicited which showed that the trademarks were sold with the liquidators' actual knowledge that Adams had sought to bid for them if given an opportunity, without prejudice to its rights. That opportunity was never forthcoming although it was also established that Adams' Spanish counsel had made a written purchase offer to the liquidators who never acted on it.

Furthermore, the liquidators and the purchaser of the trademarks, Bambu, knew of the litigation in the Illinois District Court as evidenced by the trademarks purchase agreement provision which mentioned the litigation. The liquidators also specifically knew of Adams' motion in that action to impose a lien, as evidenced by the affidavit of the attorney for the liquidators in opposition to the motion. Nevertheless, the liquidators proceeded to sell the trademarks before the issuance of the decision by the District Judge without advising Adams or the court of the sale.

It was also testified to by one of the Spanish insolvency experts in this court that in his opinion the sale was in compliance with Spanish law, thus the sale would not be investigated, questioned or overruled by the Spanish court. If this court were to defer to the Spanish proceeding, it would be countenancing what undoubtedly would be in contravention of the bankruptcy law of this country, which requires a similar sale to be conducted after notice to all creditors and prospective purchasers after a hearing to consider bids for the property as provided for by § 363(b) which necessitates such notice and a hearing.

Other questionable conveyances are suspected in Papeleras's post-petition activities as gleaned from the trial in this court. Testimony reflects that about $1,200,000 of Papeleras's raw materials as well as an unknown amount of machinery to make the Bambu paper were disposed of. No explanation was given as to the consideration paid to the liquidators for the same, and if money was paid, to what use the proceeds were put. As has already been noted there is presently about $20,000 to $30,000 in property of the estate to be liquidated. It was testified to that the Papeleras workers are the only unsecured creditors who were partially paid. Such payments came from

Bambu's initial $200,000 payment under the purchase agreement.

When the Spanish court approved Papeleras's Suspension of Payments application in November of 1980, its assets exceeded its liabilities. Nevertheless, in excess of $20,000,000 in claims have been filed by creditors which will go unpaid. Given such facts, the possibility of fraudulent conveyances under §§ 544 and 548, or preferences as defined by § 547 of the Bankruptcy Code, having occurred in the Spanish proceedings should not be ruled out. If this court defers to the Spanish court, such transactions will undoubtedly be historical footnotes at the possible expense of all of Papeleras's creditors, including Adams.

By reason of all of the foregoing, this court finds that Adams' efforts to satisfy its judgment in this country does not constitute a preferential or fraudulent disposition of property of Papeleras's estate and for that reason, this court should not relegate Adams to undoubtedly unfair and inequitable treatment in the Spanish court.

### D. § 304(c)(4): Foreign Distribution of Proceeds Substantially in Accordance with Title 11

Secured creditors other than judgment lien creditors in a Spanish proceeding are not stayed by an automatic stay. They may enforce their claims at any time without approval of the Spanish court supervising the Suspension of Payment proceeding. Conversely, unlike the Spanish law, the Bankruptcy Code in our country, pursuant to § 362, provides for an automatic stay generally applicable to all creditors including secured creditors.

The laws of both countries with respect to the distribution of funds in an insolvency proceeding are also markedly different. In Spain, non-judgment lien secured creditors have the highest priority. Judgment lien creditors, such as Adams, are treated as general unsecured creditors. It has been established that in the Papeleras proceedings undoubtedly there will be nothing for the unsecured creditors. On the other hand, under the Bankruptcy Code valid liens pass through the bankruptcy case

unaffected, as provided for by § 506(d), except for certain exceptions not applicable in the instant case. For example, under § 522(f) a debtor's exemptions are protected by permitting it to avoid certain liens, including judicial liens, to the extent such liens impair the exemption. The judicial lien may also be avoided if it violates § 547 to the extent that the lien may be deemed preferential in accordance with its provisions. Thus for the reasons stated, the judicial lien acquired by Adams in its action in the Northern District of Illinois is not affected by any of those sections and would be recognized as a valid lien up to the value of the property by which it is secured under § 506(a).

It is agreed by all parties that if this court defers to the Spanish proceeding, then Adams' lien, assuming at best Adams were recognized as a creditor in Spain, would be accorded the status of an unsecured claimant and would thus be denied the treatment extended to it by the Bankruptcy Code in this country.

The Seventh Circuit recognized Adams' lien as an equitable lien under Illinois law, as per its decision. *Adams Apple,* 773 F.2d at 931. Because the trademarks had been transferred prior to the time Adams was permitted to record its court-ordered lien, the lien could not be perfected. Even if this proceeding were not ancillary but rather a bankruptcy case, a trustee or debtor-in-possession would not be permitted to void an unperfected lien where the lienor did all in its power to perfect the lien and the debtor's actions prevented such perfection. *See Hassett v. Revlon (In re O.P.M. Leasing Servs., Inc.),* 23 B.R. 104, 119 (Bkrtcy.S.D.N.Y.1982); *Associates Commercial Corp. v. Trim–Lean Meat Prods. Inc.,* 10 B.R. 333, 335 (D.Del.1981); *cf. Cherno v. Dutch Am. Mercantile Corp. (In re Itemlab, Inc.),* 353 F.2d 147, 153 (2d Cir.1965) (Bankruptcy Act case). As observed by the foregoing authorities, where perfection cannot occur because of an adverse act by the debtor, the debtor should not be allowed to subsequently void the lien.

Under Illinois law, "[a]lthough an equitable lien is not judicially recognized until judgment is rendered, it relates back to the time it was created by the conduct of the parties." *Einoder v. Mount Greenwood Bank (In re Einoder),* 55 B.R. 319, 327 n. 29 (Bkrtcy.N.D.Ill.1985) (citing *Marbach v. Gnadl,* 73 Ill.App.2d 303, 315, 219 N.E.2d 572, 579 (1st Dist.1966) (equitable lien on fire insurance proceeds became effective when building burned)). Accordingly, Adams' equitable lien was effective prior to the sale of the trademarks.

Inasmuch as Adams' rights either to the trademarks or their proceeds are treated completely different by the insolvency laws of this country as expressed by the Bankruptcy Code which provides it with a superior and preferential status, as distinguished from the Spanish law which relegates its lien claim to a subordinated position on a parity with all other unsecured claimants, the effect of such a difference in treatment further justifies the dismissal of these ancillary proceedings.

### E. *§ 304(c)(5): Comity*

■ The consideration of comity requires, *inter alia,* an analysis of the effect that the recognition of a foreign proceeding has upon the laws, public policies and the rights of citizens of the United States. *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), a United States Supreme Court decision involving the state court enforcement of a French judgment, stated:

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Id.* at 164, 16 S.Ct. at 143; *see Somportex, Ltd. v. Philadelphia Chewing Gum Corp.,* 453 F.2d at 440.

Several bankruptcy courts have adopted a standard when evaluating comity within § 304(c)(5) which results in the comity factor becoming the focal point while subordinating or eliminating the other § 304(c) factors from consideration. *See Metzeler v. Bouchard Transportation Co. (In re Uni–Petrol Gesellschaft fuer Mineralolprudukte),* 78 B.R. 674, 677, 16 B.C. D. 662, 664 (Bkrtcy.S.D.N.Y.1987) ("the overall purpose of § 304: to afford comity through ancillary administration"); *Gee,* 53 B.R. 891 (Bkrtcy.S.D.N.Y.1985) ("Although comity is only one of six factors to be considered in determining whether to grant relief, it often will be the most significant, as here, where it serves as the crux of [the] debtor's argument"); *Culmer,* 25 B.R. at 629, 9 B.C.D. 1283, 1288 ("All of the factors listed in Section 304(c) have historically been considered within a court's determination whether to afford comity to a proceeding in a foreign nation ... Thus, this court will look to the other relevant factors enumerated in § 304(c) to determine whether the evidence presented as to Bahaminian law indicates that its application therein would be wicked, immoral or violate American law and public policy"). However, the legislative history reflects that when Representative Don Edwards introduced the final bill to the House, he stated: "Section 304(c) is modified to indicate that the court shall be guided by considerations of comity *in addition* to the other factors specified therein." Bankruptcy Reform Act of 1978, Pub.L. No. 95–598. (Emphasis added). Thus, it is best to equally consider all of the variables of § 304(c) in determining the appropriate relief in an ancillary proceeding.

In affirming the decision of the District Court, the Seventh Circuit stated that it rejected Papeleras's argument "that principles of international comity require that we vacate the district court's order imposing the lien ... On the record before us, no actual conflict with the Spanish proceeding exists." *Adams Apple,* 773 F.2d at 931.

In light of all of the foregoing facts peculiar to this instant case, if this court should defer to the Spanish proceeding, Adams will be prejudiced by the omissions

of Spanish law and the lack of candor by Papeleras and liquidators. The principles of comity dictate the dismissal of the ancillary proceedings.

### F. *Opportunity for a Fresh Start*

This factor is inapplicable; Papeleras has been liquidated.

### II. *Relief*

The Bankruptcy Code enumerates several types of relief available in bankruptcy cases ancillary to foreign proceedings. The court may: (1) enjoin the actions or the enforcement of judgments against the debtors, § 304(b)(1); (2) order the turnover of property or proceeds to the foreign representative, § 304(b)(2); (3) order other relief, § 304(b)(3); or (4) order the ancillary case be dismissed or suspended, § 305.

Relief is determined by the considerations of § 304(c). As concluded *supra*, of the six applicable factors, reorganization not being relevant, only one factor, "the economical and expeditious administration of [the] estate," might suggest, if that factor were the only one existent, that the Spanish liquidators receive the proceeds of the trademarks. However, as has been fully discussed, the other five factors overwhelmingly dictate that this court dismiss the ancillary proceedings and go forward with the fraudulent conveyance action so as to determine Adams' rights to the trademarks or their proceeds.

Submit an order consistent with this opinion.