**In re McLEAN INDUSTRIES, INC., et al., Debtors.**

**Bankruptcy Nos. 86 B 12238–86 B 12241.**

United States Bankruptcy Court, S.D. New York.

Aug. 12, 1988.

Milbank, Tweed, Hadley & McCloy, New York City, by J. Thomas Beckett, for debtors-in-possession.

Goetz, Fitzpatrick & Flynn, New York City by Andre H. Friedman, John S. Pereira, New York City, for Nat. State Bank of New Jersey.

## DECISION

HOWARD C. BUSCHMAN, III, Bankruptcy Judge.

The National State Bank of New Jersey ("NSB" or the "Bank") seeks an order modifying the automatic stay, pursuant to 11 U.S.C. § 362(d), to permit it to offset $400,000, deposited in NSB account No. 200–392–611 (the "Account") by United States Lines, Inc. ("U.S. Lines"), on the ground that it paid said sum in honoring a letter of credit it issued on behalf of U.S. Lines. To this, United States Lines, one of the debtors and debtors-in-possession in these jointly administered estates, objects on the ground that to permit setoff is inconsistent with the agreement governing the letter of credit. This matter has been deemed an adversary proceeding with the Bank's motion treated as the complaint and the Debtor's objection treated as the answer. Trial was held on stipulated facts and admission of deposition transcripts and the exhibits thereto on July 13, 1988.

## I

These transcripts and exhibits reveal that prior to January, 1983, U.S. Lines was a customer of the Bank's Cranford New Jersey branch. In January, 1983, NSB sent to U.S. Lines its standard form for letter of credit agreements entitled "Continuing Letter of Credit Security Agreement" (the "Agreement"). (*Stipulation of Uncontested Facts* ¶ 16). U.S. Lines responded with a letter (the "Cover Letter") to NSB on January 6, 1983 stating that it would not agree to certain terms. With the Cover Letter, U.S. Lines returned the Agreement with changes inserted that lowered NSB's customary rate for issuance of a letter of credit to ½% and deleting certain terms providing for setoff and pledge of security. These changes and deletions expressed "the only way in which [U.S. Lines] would accept this document", (*Brady Depo.* 14:23–25), particularly in light of its

other loan agreements that did not "permit [U.S. Lines] to pledge [its] assets or provide security". (*Cover Letter*).

Significant here is the deletion by U.S. Lines of the clause in the Agreement providing that on default by U.S. Lines in reimbursing the Bank:

> [U.S. Lines] ... expressly authorizes the Bank ... to apply ... any balance of deposits and any sums credited by or due from the Bank to [U.S. Lines] in general account or otherwise to the payment of any and all such obligations and/or liabilities....

Also of significance is the deletion of the clause that purported to give NSB "a general lien upon and/or right of setoff against, all right, title and interest of [the Debtor] in and to the balance of every deposit account, now or at any time hereafter existing of [the Debtor] with [NSB]." Both U.S. Lines' modifications to the Agreement and the Cover Letter were noted by NSB. (*Stipulation of Uncontested Facts* ¶ 19).

It is undisputed that the Agreement is the governing document concerning this dispute. (*Trial on Stipulated Facts* 9:20–23). Solidifying that notion is the fact that the Agreement itself precludes modification unless specifically agreed to in writing. Indeed, the Bank would not issue a letter of credit without having on file a current security agreement. (*Applegate Depo.* 17:12–25).

Other than the amendment by U.S. Lines to the Agreement, no discussions between NSB and U.S. Lines occurred regarding waiver of the Bank's common law setoff rights. (*Stipulation of Uncontested Facts* ¶ 17). But no one has specific recollection of the Agreement and Cover Letter. (*Brady Depo.* 6:19–21); (*Applegate Depo.* 6:18–19) (Applegate not involved with NSB's relationship with U.S. Lines in January, 1983); (*Boyles Depo.* 12:4–16). On January 14, 1983, NSB issued Irrevocable Letter of Credit No. 8651 (the "First Letter of Credit") in favor of the beneficiary. (*Stipulation of Uncontested Facts* ¶ 12). A loan offering ticket prepared by NSB for its internal use in connection with the First

Letter of Credit shows "approval without collateral" and "[Agreement] in file." (*Id.* at ¶ 10). Among other things, it indicates that the accommodation was "not guaranteed" and "not endorsed." (*Id.*) Furthermore, an internal memorandum, dated January 13, 1983, prepared by James Boyles, then Executive Vice President and Senior Lending Officer of NSB and addressed to NSB's regional loan department, states the First Letter of Credit "is approved without collateral." (*Id.* at ¶ 11).

In 1984, the Bank was "in the posture of soliciting additional business from U.S. Lines and [was] receptive to proposals for new transactions." (*Applegate Depo.* 13:14–16). On May 4, 1984, U.S. Lines applied to NSB (the "Second Application") for an irrevocable standby letter of credit for the account of U.S. Lines and in favor of the beneficiary in the original amount of $400,000. (*Stipulation of Uncontested Facts* ¶ 14). By its terms, the Second Application was "made subject to the [Agreement] heretofore executed by [U.S. Lines] and delivered to [NSB], the provisions of which are hereby made applicable to this Application and the [Second Letter of] Credit." (*Id.* at ¶ 15). NSB's procedures did not require the review of the Agreement for approval of the Second Application because "the [Agreement] had been received, processed, accepted and filed." (*Applegate Depo.* 18:2–11). NSB's loan offering ticket prepared for internal use in connection with the Second Application indicates that in accordance with the Agreement, the "fee" will be ½% and the accommodation is "not guaranteed" and "not endorsed" (*Stipulation of Uncontested Facts* ¶ 16).

On the basis of the Second Application and Agreement, (*Id.* at ¶ 19), NSB issued Irrevocable Standby Letter of Credit No. 10149 (the "Second Letter of Credit") for the account of U.S. Lines and in favor of the beneficiary on May 8, 1984. The beneficiary could draw down the Second Letter of Credit upon presentation of a sight draft

and appropriate certification by an officer of the beneficiary. U.S. Lines paid and NSB accepted the ½% commission indicated in the Agreement. (*Id.* at ¶ 20).

At the filing of U.S. Lines' bankruptcy petition, more than $400,000 was on deposit in the Account. In view of the outstanding Second Letter of Credit for the sum of $400,000, NSB on the Petition Date administratively froze $400,000 for the purported purpose of preserving its right of setoff. (*Id.* at ¶ 21). A $400,000 sight draft was presented by the beneficiary against the Second Letter of Credit on December 19, 1986, together with the signed certificate required by the Second Letter of Credit and the Second Application. (*Id.* at ¶ 22). NSB honored the sight draft ten days later, by issuing a cashier's check in the amount of $400,000 to the order of the beneficiary in accordance with the terms of the Second Letter of Credit and in satisfaction thereof. (*Id.* at ¶ 23).

## II.

The principal issue in this proceeding is whether NSB has satisfied its burden of proof in demonstrating that it has a right of setoff in this particular case, *i.e.:* whether, since the contract defines the rights of the parties, NSB may be permitted to setoff funds in the U.S. Lines' general depository account at the Bank notwithstanding the express deletion of two phrases from the contract permitting such. NSB advances three arguments supporting its right of setoff: (1) although U.S. Lines' modifications excised the right to setoff from the contract, NSB's right to setoff is not dependent on an agreement but is implied by law; (2) extrinsic evidence demonstrates that NSB did not intend to relinquish its right of setoff; and (3) Articles II and V of the Uniform Commercial Code (the "UCC") operate to preserve NSB's right to setoff.[1]

---

**1.** NSB also contends that U.S. Lines' argument sounds in waiver and neither reliance nor a knowing relinquishment of rights has been proven. However, U.S. Lines does not present a waiver argument, but rather a contractual inconsistency analysis. (*Trial on Stipulated Facts* 30:21–24).

A

■ NSB claims its right to setoff is grounded in section 553 of Title 11 which provides, in pertinent part, as follows:

> Except as otherwise provided in this section and in sections 362 and 363 ... this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case ...against a claim of such creditor against the debtor that arose before the commencement of the case....

11 U.S.C. § 553(a).

■ Section 553 is, however, not an independent source of a right to setoff; rather, it recognizes and preserves, but does not define, the common law right of setoff under non-bankruptcy law. *Elsinore Shore Assocs. v. First Fidelity Bank (In re Elsinore Hotel Shore Assocs.)*, 67 B.R. 926, 942 (Bankr.D.N.J.1986) (Section 553 does not affect common law right of setoff); *Commerce Union Bank v. Haffner (In re Haffner)*, 12 B.R. 371, 373 (Bankr.M. D.Tenn.1981). A creditor seeking to setoff a debt under Title 11, therefore, must establish a claim and a right to setoff by applying the law of the state where the operative facts occurred, *In re Chestnut Co.*, 39 B.R. 519, 521 (Bankr.D.S.C.1984); here they occurred in New Jersey. Section 553, moreover, does not expand non-bankruptcy rights and clearly provides that the automatic stay provisions of section 362 limit post-petition setoff rights, requiring creditors to obtain court permission before taking any action against the property of the estate. *In the Matter of Hazelton*, 85 B.R. 400, 403 (Bankr.E.D.Mich.1988); *In the Matter of Woloschak Farms*, 74 B.R. 261, 264 (Bankr.N.D.Ohio 1987); *see also United States v. Norton*, 717 F.2d 767, 772 (3d Cir.1983) (Section 553 is permissive not mandatory). The burden of proof, moreover, squarely rests with NSB in demonstrating its entitlement to setoff in light of the facts of this case. *Pester Refining Co. v. Mapco Gas Prods., Inc.*, 845 F.2d 1476, 1486 (8th Cir.1988) (Burden on creditors to establish valid rights of setoff).

B

While NSB is undoubtedly correct in arguing that setoff does not depend on the parties having contractually agreed to the right, it does not follow that such a right survives when its exercise is inconsistent with an express agreement between the parties. It is well-settled in New Jersey and elsewhere that setoff may be limited or precluded by agreement or mode of dealing. *See Pepsi Cola Bottling Co. v. First Nat'l Bank of Columbus*, 248 Ga. 114, 281 S.E.2d 579 (1981). *Hudson United Bank v. House of Supreme, Inc.*, 149 N.J.Super. 153, 157, 373 A.2d 438, 440 (N.J.Super.Ct. Ch.Div.1977) (Bank's right to setoff is controlled when there is an agreement showing setoff was not intended by the parties, or where the circumstances or the particular modes of dealing are inconsistent with its existence); *Sherberg v. First Nat'l Bank of Englewood*, 122 Colo. 407, 222 P.2d 782 (*en banc*) (1950) (setoff may be controlled by agreement or course of performance); *Forastiere v. Springfield Inst. for Sav.*, 303 Mass. 101, 103, 20 N.E.2d 950, 952 (1939) ("[T]he right of a bank to set-off ... 'may be changed or eliminated by a contract between bank and customer'"), *quoting, Boston–Continental Nat'l Bank v. Hub Fruit Co.*, 285 Mass. 187, 190, 189 N.E. 89, 91 (1934); *Am. Surety Co. v. De Escalada*, 47 Ariz. 457, 56 P.2d 665, 666 (Sup.Ct.Ariz.1936) (The right of setoff may be controlled by any special agreement which shows that it was not intended by the parties, and the right does not exist where it is inconsistent with the parties' contractual relationship); *cf. Beck v. Nutrodynamics, Inc.*, 77 N.J.Super. 448, 186 A.2d 715 (N.J.Super.Ct. Law Div.1962) (A common law lien can be precluded by contract).

Thus, in New Jersey, "the right of setoff is based on the contractual relationship between the parties [and] the relevant contracts between the bank and [its depositor] must be examined to determine whether the bank is entitled to a right of set-off." *Hudson United Bank v. House of Supreme, Inc.*, 149 N.J.Super. at 160. Setoff exists in New Jersey moreover only for obligations made "in the usual course of

business *without restrictions."* *Fed. Deposit Ins. Corp. v. Pioneer State Bank.*, 155 N.J.Super. 381, 389–90, 382 A.2d 958, 962 (N.J.Super.Ct. Law Div.1977) (emphasis added). In interpreting a contract, New Jersey courts prefer giving reasonable, lawful and effective meaning to all admissible manifestations of intent rather than leaving a part of such manifestation unreasonable, unlawful or ineffective. *Maryland Casualty Co. v. Hansen–Jensen Inc.*, 15 N.J.Super. 20, 27, 83 A.2d 1, 4 (N.J.Super.Ct.App.Div.1951); *Cameron v. Int'l Alliance of Theatrical Stage Employees & Moving Picture Operators*, 119 N.J.Eq. 577, 587, 183 A. 157, 162 (N.J.Prerog.Ct. 1936); *Restatement (Second) of Contracts* § 203(a) (1979).

■ By selectively crossing out all references to setoff, and by initialing its modifications, U.S. Lines manifested an obvious and deliberate intent to restrict the Agreement to preclude setoff. *See Greives v. Bank of W. Indiana (In re Greives)*, 81 B.R. 912, 953 (Bankr.N.D.Ind.1987) (handwritten terms prevail over printed terms); *see also Restatement (Second) of Contracts* § 203, comment f (1979) (a typewritten term may be superseded by drawing a line through it). Thus, NSB's contention that U.S. Lines' modifications created a contract that is silent as to setoff is unpersuasive. The Cover Letter clearly indicated that U.S. Lines had "deleted applicable paragraphs". Furthermore, U.S. Lines "executed those crossouts to express [its] understanding and the only way in which [it] would accept [the Agreement]." (*Brady Depo.* 14:23–25). Most significantly, it deleted the provision that would have enabled the Bank on U.S. Lines' default to

apply the funds in U.S. Lines' depository accounts to the amount owed the Bank, *i.e.:* to set them off. To accept NSB's contention, therefore, would be to accept a disfavored view of contractual interpretation, render U.S. Lines' modifications meaningless and ineffective, and permit NSB to apply those very funds to the amount owed it.

Recognizing the clarity of the language deleted from the agreement, NSB argues that the Agreement consists of only the non-deleted portions and that the deleted portions are to be ignored. This selectivity disregards the New Jersey and general rule that all admissible manifestations of intent are to be considered, *Cameron*, 119 N.J.Eq. at 587, 183 A. 157, *Maryland Casualty*, 15 N.J.Super. 27, 83 A.2d 1, and is thus without merit. It would be one thing if the contract form sent by the Bank to U.S. Lines did not originally contain the portions subsequently deleted by U.S. Lines in signing the Agreement. It is quite another where those provisions were included on the form and then deleted. The deletions clearly manifest the intention that the funds in U.S. Lines' accounts at the Bank are not to be applied against U.S. Lines' default in reimbursing NSB for the sums paid under a letter of credit.

## C

■ Accordingly, NSB asserts that there are other manifestations of intent:[2] (1) the testimony of NSB officials saying the Bank never intended to relinquish its right of setoff; and (2) the absence of any contemporaneous document, correspondence or internal memoranda in NSB's files consenting to an elimination of its right of setoff.[3]

2. NSB thus takes the highly unusual step of a bank attempting to disavow the plain import of its own documentation. *Cf. Barclays Bank of New York v. Goldman*, 517 F.Supp. 403 (S.D.N. Y.1981).

3. In February, 1983, U.S. Lines' request for a 5 million dollar line of credit from NSB was approved. The line of credit was not predicated on NSB relinquishing its common law right of setoff. NSB asserts that the line of credit's terms dispose of the question of U.S. Lines' intent with respect to the Agreement governing

the $400,000 letter of credit currently at issue. Despite the fact that the line of credit is an isolated and unrelated transaction with respect to the Agreement governing the letters of credit, it is reasonable for U.S. Lines to request an agreement precluding setoff with respect to letters of credit only. While the line of credit exposed U.S. Lines' funds to risk for three month periods, the letters of credit issued pursuant to the Agreement created exposure for periods exceeding four years. More importantly, the initial letter of credit transaction concerned the much smaller sum of $275,000 and

These contentions are also without merit.[4]

At the trial, NSB conceded that the Agreement is the governing document. (*Trial on Stipulated Facts* 9:20–23). The Agreement itself manifests the intention that deposited funds are not to be applied to a debt owed with respect to a letter of credit and adds further that it cannot be amended except in writing. Nevertheless, in support of its argument, NSB places great weight on the depositions of its officers in arguing that NSB and U.S. Lines did not discuss any agreement by NSB to abandon its right of setoff.

That argument, however, ignores the inconclusive and general nature of the deposition testimony. None of the deponents had a specific recollection of the relevant documents, particularly the Agreement. For example, NSB emphasizes that James Boyles, who says that he must have received and reviewed the Agreement, testified that there were no discussions relating to setoff. But Boyles also testified that he has no significant recollection of the transaction. (*Boyles Depo.* 12:4–20; 15:6–15). Thus, the testimony of his actual participation in approving the Agreement offers nothing that could be construed as varying the intention actually manifested by the Agreement. The uncertainty of his testimony is shown, moreover, by his further testimony that upon reviewing U.S. Lines' modifications to the Agreement: "I probably called [Brady] but I cannot swear to it that I did. If I did call, I may not have talked directly to him, I may have talked ...to one of his assistant[s]." (*Brady Depo.* 15:2–15).

Missing from this record is any testimony by one Robert Donnelly, the Vice President of NSB who was responsible for the First Letter of Credit and the Agreement. NSB attempts to cross the bridge of that deficiency with Applegate's after-the-fact testimony that waiver of a right to setoff

was against the Bank's practices and policies. (*Applegate Depo.* 18:21–25; 19:8–14). No written practices in effect in January, 1983, are in this record. What is contained in this record is a clear manifestation of the intention of these parties. Thus, regardless of the alleged practices, the fact remains that the Agreement was accepted by the Bank as the governing document.

In further attempting to show evidence of intent different from that manifested by the Agreement, NSB attempts to draw a negative inference from the absence of any contemporaneous notation in NSB's files noting anything more than that the Agreement provided for issuance of letters of credit without collateral or security. Applegate, the person directly responsible for the Second Letter of Credit, attempted to buttress this notion with testimony that the waiver of setoff would have been a "red flag" halting the internal processing of the Agreement. (*Applegate Depo.* 19:10–14). Applegate, however, also testified that he never checked the Agreement or the process by which it was accepted. (*Applegate Depo.* 18:2–11). Confirming that the Agreement, a document necessary for NSB to issue letters of credit, had been accepted by the Bank, he merely proceeded to process the application for the Second Letter of Credit. (*Id.*).

Thus both the testimony and attempted inference are unavailing. Regardless of the absence of a "red flag" or other notations, the absence of a fact can hardly overrule or outweigh an express manifestation of intent. It remains that NSB noted U.S. Lines' modifications, NSB proceeded to perform pursuant to the Agreement's terms, NSB conceded that the Agreement is the governing document, and none of the deponents had specific recollection of the documents in question. If NSB had another intention, it should have made it known. It is well settled in New Jersey that:

---

this dispute concerns $400,000. It is entirely understandable that the right might be expressly preserved on a $5 million transaction and dispensed with on a significantly smaller transaction. Moreover, one could think that the alleged care to preserve the right with respect to the line of credit indicates that the parties knew

how to take that step with respect to the instant transaction if they so desired.

4. U.S. Lines objects to the admissibility of the parol evidence. We do not have to reach that issue, however, since the extrinsic evidence is inconsequential.

[U]nder the objective theory of mutual assent followed in all jurisdictions, a contracting party is bound by the apparent intention he outwardly manifests to the other contracting party. To the extent that his real secret intention differs therefrom, it is entirely immaterial.

*Cohn v. Fisher,* 118 N.J.Super. 286, 291, 287 A.2d 222, 224 (N.J.Super.Ct. Law Div. 1972).

**D**

■ Consequently, NSB's claims of a contrary intention come to rest on its assertion that the Cover Letter by which U.S. Lines transmitted the Agreement indicates that the deletions were merely intended to avoid a pledge of assets as security and, as such, no restriction on setoff was contemplated by the parties. This assertion is of no merit. The Cover Letter clearly indicated that U.S. Lines had "deleted the applicable paragraphs" because it would not "pledge assets" *or* "provide security". While it is indisputable that both modifications expressly included the setoff provisions, NSB argues that a bank's right of setoff is not a security interest and is not a lien. The Agreement, however, explicitly included setoff as security: "[a]s security for the ...performance of [U.S. Lines'] obligations hereunder, [U.S. Lines] hereby ...pledges [to NSB] a general lien upon and/or right of setoff against [U.S. Lines' accounts]." Furthermore, the courts in New Jersey commonly refer to the right as a lien. *Pioneer State Bank,* 155 N.J.Super. at 389, 382 A.2d 958 (Bank's right to setoff is commonly referred to as a "banker's lien"); *see also Beck,* 77 N.J.Super. at 450–51, 186 A.2d 715. While that language is not determinative, it underscores the notion that the Cover Letter is not inconsistent with the actual, readily ascertainable, modifications and did not preclude NSB from realizing their import.

■ Accordingly, on both this point and its attempted negative inference, NSB's outward manifestation of intent is gleaned from the characterization of the Agreement as governing and from its acceptance by performance without protest. *See*

*Whiteman Food Prod. Co. v. Prodotti Alimentari,* 31 N.J.Super. 277, 279, 106 A.2d 321, 322 (N.J.Super.Ct.App.Div.1954) (Agreement on offeree's terms results where offeree rejects a condition of the offeror's offer and the offeror subsequently performed; such performance indicates that the offeror has acceded to offeree's terms); *Restatement (Second) of Contracts* § 62 (1979). Indeed, since no signature line existed for NSB on the Agreement, NSB could accept U.S. Lines' offer only through performance. *See In re Greives,* 81 B.R. at 956 (debtor is the only necessary signatory to a security agreement). To the extent, therefore, that NSB's now asserted "real secret intention" was not to lose its right of setoff, "it is entirely immaterial". *Cohn v. Fisher,* 118 N.J.Super. at 291; *see United States Pipe and Foundry Co. v. Am. Arbitration Assoc.,* 67 N.J.Super. 384, 392–93, 170 A.2d 505 (N.J.Super.Ct.App.Div.1961) (An intention wholly unexpressed in an integrated agreement should not be effectuated and is irrelevant under the objective theory of contracts; thus the actual intention of a party is ineffective unless some way made known in the writing); *see also Jacobs v. Bernstein,* 156 A.D. 263, 141 N.Y.S. 287 (1st Dep't 1913) (setoff can be waived by silence), *aff'd,* 215 N.Y. 743, 109 N.E. 1079 (1915).

**E**

■ NSB's final claim that Articles II and V of the UCC, codified as Chapters 2 and 5 under Title 12A of New Jersey's Commercial Transactions Law, operate to preserve its right to setoff is frivolous because it disregards the specific areas of applicability for the Articles. Section 2–102 states that Article II applies to the sale of goods and expressly not to security agreements. Section 5–102 states that Article V applies to letters of credit and creates certain obligations among the issuer of the letter of credit, its customer, and the beneficiary of the letter of credit. Section 5–109, on which NSB principally relies, concerns the obligations of the issuer, here NSB, to its customer, U.S. Lines. It does not concern the obligation of the customer

to the issuer. The issuer's right of reimbursement is set forth in section 5–114, on which NSB does not rely. There it is stated that:

> (3) Unless otherwise agreed an issuer which has duly honored a draft or demand for payment is entitled to immediate reimbursement of any payment made under the credit and to be put in effectively available funds not later than the day before maturity of any acceptance made under the credit.

N.J.Stat.Ann. § 12A:5–114(3) (West 1988). The parties restated this language in paragraph 1 of the Agreement. Thus, neither Article V nor paragraph 1 of the Agreement preserves any right of setoff. The language of section 5–114 contemplates the immediate transfer of funds by the customer *after* due honor of a demand for payment of a letter of credit and prior to the maturity of any acceptance. It makes no provision for the deposit of sufficient funds prior to such honor so that they might be offset. Additionally, the statutory language leaves the parties free to operate pursuant to their own agreement. That is exactly what happened here. The Agreement manifests the intention that on default NSB could not recover from the funds deposited in the Bank by U.S. Lines.

### III

In conclusion, NSB has not met its burden of establishing a right to exercise a setoff in this case and therefore may not set off the $400,000 in the U.S. Lines account.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

SETTLE ORDER.