In re Petition of Alison J. TRECO and David Patrick Hamilton, as Liquidators of Meridien International Bank Limited (In Liquidation), Debtor in Foreign Proceedings.

No. 99 Civ. 3442(AGS).

United States District Court, S.D. New York.

Sept. 10, 1999.

Stroock & Stroock & Lavan LLP, New York City, for Liquidators.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Bank of New York and JCPL Leasing Corp.

## OPINION AND ORDER

SCHWARTZ, District Judge.

The Bank of New York and JCPL Leasing Corp. ("Appellants") appeal from the judgment of the bankruptcy court granting partial summary judgment and ·requiring Bank of New York ("BNY") to turnover certain funds to Appellees, the foreign liquidators of Meridien International Bank Limited ("MIBL"). Appellants contend that the turnover order (i) is an abuse of discretion under 11 U.S.C. § 304(c) because BNY holds a security interest in said funds, (ii) is not lawful because the bankruptcy court failed to provide adequate protection for BNY's alleged security interest before ordering turnover, and (iii) is not lawful because it prevents BNY from exercising its set-off rights. For the reasons that follow, the decision of the bankruptcy court is AFFIRMED.

## FACTUAL BACKGROUND

The following facts are undisputed for the purposes of this motion. *See In Re Treco*, 229 B.R. 280, 283–84 (Bankr.

S.D.N.Y.1999).[1] MIBL is a bank incorporated under the laws of the Bahamas. It has conducted business in the Bahamas, Africa and various other jurisdictions, including the United States.

In June 1993, MIBL entered into a loan agreement with BNY. Pursuant to a pledge agreement executed on June 15, 1993 (the "MIBL Pledge Agreement"), MIBL pledged certain of its own bank accounts (the "MIBL Accounts") as security for that loan. Later that year, BNY agreed to permit MIBL to overdraw these accounts, but required that Meridien BIAO Bank Tanzania Limited ("Meridien Tanzania"), a related company,[2] pledge certain of its accounts at BNY to BNY (the "Meridien Accounts") as security for MIBL's overdrafts. Meridien Tanzania pledged those accounts to BNY in a November 15, 1994 agreement (the "Meridien Pledge Agreement"). The Meridien Pledge Agreement provided that BNY could use funds on deposit in the Meridien Accounts to satisfy MIBL's loan obligations if at any time BNY deemed itself to be insecure. BNY's advances to MIBL ultimately aggregated in excess of $15 million. These funds were never repaid by MIBL.

On or about March 28, 1995, Meridien BIAO Bank of Swaziland Limited commenced an involuntary liquidation proceeding against MIBL in the Supreme Court of the Bahamas. By order dated April 25, 1995, the Bahamian court directed that MIBL be placed into compulsory liquidation, and appointed Appellees as MIBL's official liquidators. Effective March 28, 1995, BNY applied all of the funds in the Meridien Accounts to MIBL's debt with BNY. BNY did not, however, liquidate the funds remaining in the MIBL Accounts.

In April 1995, the Central Bank of Tanzania appointed a Manager to operate Meridien Tanzania, who subsequently questioned the validity of the Meridien Pledge Agreement and demanded that BNY return the $15 million that it had removed from the Meridien Accounts. In June 1995, BNY commenced an action in the United States District Court for the Southern District of New York (the "1995 action") against MIBL, Meridien Tanzania, and certain other entities. In that action, BNY sought, *inter alia,* (i) a declaratory judgment rejecting Meridien Tanzania's claim for the return of the approximately $15 million in the Meridien Accounts and declaring that BNY has the right to those funds, and (ii) a declaratory judgment that BNY may apply funds remaining in the MIBL Accounts against the amount owed to it by MIBL in the event it does not prevail on its other causes of action. Meridien Tanzania's assignee moved for partial summary judgment on the issue of BNY's rights to the Meridien Accounts, contending that Meridien should be entitled to the return of these funds, but this motion was denied in a Memorandum Order and Opinion dated February 10, 1997. *See Bank of New York v. Meridien BIAO Bank Tanzania Limited,* Case No. 95 Civ. 4856(SS), 1997 WL 53172 (S.D.N.Y. Feb. 10, 1997) (Sotomayor, J.) On June 22, 1998, after trial of the dispute in the district court, and while the matter was *sub judice,* Meridien Tanzania's assignee and BNY entered into a settlement agreement (the "Tanzania Settlement") pursuant to which BNY, *inter alia,* agreed to pay Meridien Tanzania's assignee $4 million plus attorneys' fees in full satisfaction of all claims. Also, as part of the Tanzania Settlement, BNY was assigned all of Meridien Tanzania's rights of subrogation with respect to the MIBL Accounts.[3]

---

1.  Additional facts were supplied by the parties in their memoranda of law and on oral argument. To the extent that they are discussed here and are relevant, these facts are undisputed.

2.  MIBL holds 74% of the stock of Meridien BIAO, S.A., which in turn owns 100% of Meridien Tanzania's stock. *See Treco,* 229 B.R. at 288.

3.  BNY asserts that Meridien Tanzania had acquired subrogation rights as a matter of law

### THE PROCEEDINGS BELOW

On September 29, 1995, Appellees, as MIBL's liquidators, commenced this action by filing a petition on behalf of MIBL pursuant to 11 U.S.C. § 304 (" § 304"). Section 304 permits a foreign representative, often a liquidator, to file an "ancillary proceeding" in a United States bankruptcy court, authorizing the bankruptcy court to administer assets located in the United States in order to "prevent dismemberment by local creditors of assets located here." *In Re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 348 (2d Cir.1992). Among the powers given to a bankruptcy court acting pursuant to § 304 is the ability to "order turnover of the property of [the debtor's] estate, or the proceeds of such property, to such foreign representative...." *See* 11 U.S.C. § 304(b)(2).

In the bankruptcy court, Appellees sought, *inter alia*, an order directing that all persons or entities in possession of MIBL's assets turn over those assets, or the proceeds thereof, to Appellees. BNY opposed the turnover order, asserting that it should not be required to turnover the funds in the MIBL Accounts, of which approximately $600,000 remain.

BNY opposed the application for a turnover order on various grounds, two of which are relevant here.[4] First, BNY asserted that it was a secured creditor with respect to the MIBL Accounts,[5] and that, although BNY's secured status would be recognized by the Bahamian courts, it is unlikely that BNY will recover the value of its collateral in the Bahamian proceeding because of one particular difference between Bahamian and U.S. bankruptcy law. In particular, BNY asserted that, under Bahamian law as opposed to U.S. law, BNY's interest will be subordinated to (i) the administrative costs of the liquidation, (ii) taxes, (iii) pre-petition wages, and (iv) personal injuries to workmen. BNY asserted in the bankruptcy court that (i) this priority system, (ii) the severe shortage of funds available to the liquidators, (iii) the high fees paid for estate administration,[6] and (iv) the large amount of outstanding claims, together raised a serious question as to whether there would be any funds available for its own secured claim.

The second rationale that BNY asserted in opposing the turnover request was that BNY was entitled to set-off MIBL's debts to it from the funds remaining in the MIBL Accounts. BNY asserted that it was improper to order turnover given that the bankruptcy code explicitly preserves its set-off rights.

Appellees moved the bankruptcy court for partial summary judgment on the issue of the turnover of the MIBL Accounts. BNY opposed the motion, asserting that a trial should be conducted in order to determine whether Appellees are entitled to turnover. The bankruptcy court rejected all of BNY's legal contentions and granted partial summary judgment to Appellees,

upon BNY's use of Meridien Tanzania's funds in satisfaction of MIBL's debt.

4. The Court does not address the grounds asserted in opposing the turnover order in the bankruptcy court that were not argued on this appeal.

5. BNY asserts there that it is a secured creditor of the MIBL Accounts in two respects: (i) by virtue of the fact that MIBL pledged these accounts to BNY in the MIBL Pledge Agreement; and (ii) as assignee of Meridien Tanzania's claim under the law of subrogation. (Appellants' Mem. at 15.) With respect to the latter claim, BNY asserts that upon BNY's use of Meridien Tanzania's accounts, Meridien

Tanzania became a subrogee to BNY's rights as a secured creditor of MIBL, and, upon assigning those rights back to BNY, these rights remain those of a secured creditor. This "subrogation" argument is apparently asserted as an alternative in the event that the court concludes that BNY's rights as a secured creditor terminated upon its initial liquidation of the Meridien Accounts.

6. BNY argues that, at the depositions of the liquidators, it was admitted that the liquidators, partners in the accounting firm of KPMG Peat Marwick, will receive a 50% premium over their hourly charges as part of the administrative costs of the liquidation. (Appellants' Mem. Law at 13.)

ordering that the MIBL Accounts be turned over to them. The court concluded, *inter alia*, that, even assuming that BNY was a secured creditor of MIBL, (i) turnover of the MIBL Accounts should be directed as an appropriate exercise of discretion given that the bankruptcy laws in the Bahamas provide for the distribution of funds substantially in accordance with the order provided by the U.S. bankruptcy code; and (ii) a bankruptcy court ordering turnover of property in the possession of a secured creditor pursuant to § 304(b)(2) need not insure that "adequate protection" is provided for the secured creditor's interest in the property. The bankruptcy court also concluded that BNY's set-off claims were unavailing because § 553 of the Bankruptcy Code, which preserves the right to set-off claims in bankruptcy proceedings, does not apply to § 304 ancillary proceedings.

### DISCUSSION

The Court will review the decision of the bankruptcy court *de novo* for questions presented that are matters of statutory interpretation. *See Koreag*, 961 F.2d at 358; *Truck Drivers Local 807, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Carey Transp. Inc.*, 816 F.2d 82, 88 (2d Cir.1987). The bankruptcy court's reliance on the factors of § 304(c) and its decision to defer to the Bahamian proceeding will be reviewed for an abuse of discretion. *See In re Singer*, 205 B.R. 355, 356 (S.D.N.Y. 1997); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993).

### I. THAT BNY MAY BE A SECURED CREDITOR DOES NOT PREVENT TURNOVER.

BNY asserts that, if it is found to be a secured creditor, turnover is an inappropriate exercise of discretion for a § 304 ancillary court because the guidelines in § 304(c) do not weigh in favor of turnover. In particular, BNY contends that the dis-

tribution of funds under Bahamian procedure would not be substantially in accordance with that under U.S. bankruptcy law. *See* § 304(c)(4). Additionally, BNY asserts that, although § 304 does not, on its face, further limit the bankruptcy court's ability to order turnover, the bankruptcy code requires that property in the possession of a secured creditor not be the subject of a turnover order in a § 304 proceeding unless the court insures that "adequate protection" is provided to the creditor. Third, BNY asserts that, even if the bankruptcy code does not require adequate protection, turnover absent adequate protection, under the circumstances of this case, will amount to a taking in violation of the Fifth Amendment to the United States Constitution. The Court finds no merit to any of these contentions.

### A. DISTRIBUTION OF THE MIBL ACCOUNTS IN THE BAHAMIAN PROCEEDINGS WILL BE SUBSTANTIALLY IN ACCORDANCE WITH THE ORDER PRESCRIBED BY THE BANKRUPTCY CODE

In determining whether to grant relief to a foreign liquidator, § 304 directs the bankruptcy court to consider the following factors:

what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) *distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;*

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

*See* 11 U.S.C. § 304(c) (emphasis added). In opposing transfer, BNY relies primarily on factor (4). However, none of the factors listed in § 304(c) is an absolute requirement—rather, these factors are "guidelines ... designed to give the court maximum flexibility in handling ancillary cases." *In re Culmer*, 25 B.R. 621, 628 (Bankr.S.D.N.Y.1982) (citing legislative history of § 304).

█ In exercising the discretion granted by § 304, bankruptcy courts have taken a variety of approaches, with the two principal theories known as "universality" and "territoriality."[7] On the one hand, § 304 was designed to encourage courts to defer to foreign proceedings in order to "prevent dismemberment by local creditors of assets located here." *Koreag*, 961 F.2d at 348 (internal citations omitted). On the other hand, § 304 takes into account that relief may be inappropriate in some cases, for example, where it might prejudice local creditors in the processing of their claims or result in a distribution of proceeds that differs substantially from the order prescribed by the U.S. bankruptcy code. *See* § 304(c)(2) and (4). U.S. courts "are increasingly supportive of the philosophy underlying universality and are employing the doctrine in an ever growing number of cases and circumstances." *See Hourani*, 180 B.R. at 64. This Court agrees with this trend towards granting deference to foreign proceedings, which furthers the purposes of § 304 in promoting efficiency in international bankruptcies and encouraging other countries to defer similarly to U.S. proceedings.

█ BNY asserts that the distribution of proceeds in the Bahamian proceeding will not be substantially in accordance with the order prescribed by the U.S. bankruptcy code. Section 304(c)(4), however, "does not command that the distributive scheme wholly replicate ours." *In re Brierley*, 145 B.R. 151, 166 (Bankr.S.D.N.Y.1992). In fact, prior U.S. courts have already concluded that the distribution scheme of the Bahamas, "a sister common law jurisdiction," is fundamentally fair and generally satisfies the standard set forth in § 304(c)(4). *See, e.g., Culmer*, 25 B.R. at 629–632 (stating that the "liquidation laws of the Bahamas are in harmony with those of the United States" and should be afforded comity); *In re Hackett*, 184 B.R. 656, 658 (Bankr.S.D.N.Y.1995) (affording comity to a Bahamian bankruptcy proceeding and citing *Culmer* ).

█ The only relevant difference between U.S. and Bahamian law as applied to this motion is that the Bahamian proceeding will give priority to its administrative expenses over BNY's alleged security interest.[8] The Court finds that this difference is not sufficient to render turnover inconsistent with § 304(c)(4). *Cf. Brierley*, 145 B.R. at 167 (stating that turnover should be denied where the foreign scheme is "repugnant to some fundamental Ameri-

---

**7.** As one court describes them: " '[u]niversality' is commonly defined in terms of a primary proceeding in a debtor's domiciliary country, with ancillary proceedings in other jurisdictions where the presence of assets or other matters require local assistance to the primary court. Universality places an emphasis on deference, through comity, to foreign insolvency proceedings. It is contrasted with 'Territoriality' or the 'Grab Rule' which describes the process whereby courts in each national jurisdiction sequester the property of a multinational in default and distribute it according to local rules." *In re Hourani*, 180 B.R. 58, 64 n. 9 (Bankr.S.D.N.Y.1995) (Bank-

ruptcy Judge Lifland) (citing Jay Lawrence Westbrook, *Choice of Avoidance Law in Global Insolvencies*, 17 Brook. J. Int'l L. 499 (1991)).

**8.** BNY does not assert in its memoranda of law that there are substantial claims with respect to taxes, wages, or personal injuries to workmen. Additionally, even if there were such claims, BNY implies that, due to the small size of the estate, all of the funds collected by Appellees will be applied towards administrative expenses. (Appellants' Mem. Law at 13).

can legal principle"). Prior cases that have denied turnover of collateral subject to a security interest have primarily involved situations where the foreign jurisdiction would not have recognized the claim of the creditor as secured, instead relegating the claim to unsecured status. *See, e.g., In re Toga Mfg. Ltd.*, 28 B.R. 165, 168–170 (Bankr.E.D.Mich.1983) (denying turnover to the Canadian proceeding because under Canadian law the creditor's claim, secured under U.S. law, would be considered unsecured); *In re Papeleras Reunidas, S.A.*, 92 B.R. 584, 594 (Bankr. E.D.N.Y.1988) (denying turnover because the creditor's rights would be "completely different" under Spanish law, which "relegat[ed] its lien claim to a subordinated position on a parity with all other unsecured claimants"). Here, however, all parties agree that the Bahamian system will preserve any security interest held by BNY.

BNY. cites dicta of the Second Circuit in *Koreag* as support for its claim that turnover of property in the possession of a secured creditor is not proper. The Court finds, however, that the language of that case does not aid BNY. *See Koreag*, 961 F.2d at 358. In *Koreag* the court had noted that the creditor in that case "could assert no valid security interest or other benefit of domestic law whose deprivation *might* render a turnover unfair or otherwise improper." *Koreag*, 961 F.2d at 358 (emphasis added). However, this language suggests only that, in certain circumstances, the turnover of property held by a secured creditor may be improper, and implies that, in many circumstances, the turnover order *would* be proper. The *Koreag* court, in noting the possibility that turnover may be improper under certain circumstances, was likely referring to cases where the differing treatment accorded secured creditors was much more significant than that which may occur in this case. This is supported by the fact that the *Koreag* court relied upon *Toga*—a case where the foreign jurisdiction completely failed to recognize the secured sta-

tus of a claim. This Court concludes that the language in *Koreag* is entirely consistent with the view that turnover should be permitted under circumstances where the foreign jurisdiction recognizes a claim as secured but provides priority for legitimate administrative expenses in a manner that ultimately may be detrimental to the interests of a secured claimant.

For these reasons, the Court concludes that, under the circumstances of this case, where the secured creditor's claim will be recognized as secured, but merely be subordinated to administrative expenses, the turnover order issued by the bankruptcy court was not an abuse of that court's discretion.

### B. ADEQUATE PROTECTION WAS NOT REQUIRED BEFORE ORDERING TURNOVER IN THIS CASE

In an ordinary bankruptcy proceeding, turnover of property in the possession of a secured creditor with priority will generally be accomplished in a manner that preserves the value of the collateral for the creditor. *See U.S. v. Whiting Pools*, 462 U.S. 198, 203, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983); 11 U.S.C. § 363(e). As the Supreme Court stated in *Whiting Pools:*

> Although Congress might have safeguarded the interests of secured creditors outright by excluding from the estate any property subject to a secured interest, it chose instead to include such property in the estate and to provide secured creditors with "adequate protection" for their interests. [citing § 363(e) ]. At the secured creditor's insistence, the bankruptcy court must place such limits or conditions on the trustee's power to sell, use, or lease property as are necessary to protect the creditor.

*U.S. v. Whiting Pools*, 462 U.S. at 203, 103 S.Ct. 2309. 11 U.S.C. § 363(e) codifies the requirement of adequate protection.

Nothing in the bankruptcy code, however, provides that turnover orders in an ancillary proceeding pursuant to 11 U.S.C. § 304(b)(2) are subject to the requirement of adequate protection, and in fact the wide discretion accorded to the bankruptcy court in § 304 implies that no such requirement was intended. *See Culmer*, 25 B.R. at 624 (stating that § 304 accords the bankruptcy court the ability to mold appropriate relief "in near blank check fashion").

▇▇▇ The requirement of adequate protection in domestic bankruptcy cases is derived from the principles of the Fifth Amendment to the United States Constitution. Congress' power to make uniform bankruptcy laws is subject to the Fifth Amendment's prohibition against takings. *See Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589, 55 S.Ct. 854, 79 L.Ed. 1593 (1935); *In re Persky*, 134 B.R. 81, 98 (Bankr.E.D.N.Y.1991) ("there is almost universal agreement that the power given to Congress by the Bankruptcy Clause may not overstep the limitations imposed by the Due Process and Takings Clauses of the Fifth Amendment").

▇▇▇ The security interest taken by BNY in the property of MIBL was, since its inception, subject to various limitations under U.S. and Bahamian bankruptcy law. BNY took a security interest from a Bahamian corporation and therefore implicitly subjected itself to Bahamian law. As Judge Lifland stated *Culmer*:

> [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government authorizes.... He is conclusively presumed

to have contracted with a view to such laws of that government .... [quoting *Canada Southern Ry. Co. v. Gebhard*, 109 U.S. 527, 537–38, 3 S.Ct. 363, 27 L.Ed. 1020 (1883)]. Thus, ... [the debtor's] creditors' rights are subject to foreign laws and [each creditor] must be required to pursue its remedies in the Bahamian liquidation. One who invests in a foreign corporation subjects his investment to foreign law and may not seek to obtain greater rights than his co-creditors by suing in an American court.

*Culmer*, 25 B.R. at 632. BNY does not deny that it was on notice that Bahamian law provides that the administrative expenses of the liquidation proceedings have priority over security interests.[9]

There was no Fifth Amendment taking in this case because the value of BNY's security interest has never been absolute, but has always been limited as provided by the law in effect at the time of the signing of the MIBL Pledge Agreement. Here, the relevant limitations are those imposed on BNY by Bahamian bankruptcy law and § 304 of the U.S. bankruptcy code. Section 304 explicitly envisions that the order of priority for creditors of a foreign bankrupt will be determined by the foreign jurisdiction, as long as the proceedings in that jurisdiction satisfy § 304(c). There is no evidence that § 304 is being used by the bankruptcy court to destroy a previously existing property right, because there is no assertion that the MIBL Pledge Agreement was signed prior to the enactment of § 304 or the relevant Bahamian laws. *See In re Bernier*, 176 B.R. 976, 992 (Bankr.D.Conn.1995); *United States v. Rodgers*, 461 U.S. 677, 697, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) ("If there were any Takings Clause objection

---

9. BNY also attempts to evade turnover on the grounds that the MIBL Pledge Agreement provided for New York law and a New York forum for resolving disputes. We find this argument to be meritless given (i) the limited scope of the MIBL Pledge Agreement, (ii) § 304's intent that claims related to bank-

ruptcy proceedings be litigated in a single forum when the factors of § 304(c) support deference, and (iii) the established case law granting comity to foreign proceedings despite operative forum selection clauses. *See, e.g., Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1000 (2d Cir.1993).

**44**

to [the statute at issue] such an objection could not be invoked on behalf of property interests that came into being after enactment of the provision."). As in *Bernier,* "[t]he absence of retroactive application sharply distinguishes" this case from previous authority, such as *Persky,* 134 B.R. at 90–95, that found a takings clause violation based on the retroactive application of a statute. *Bernier,* 176 B.R. at 992 (citing *Persky* ). The bankruptcy court can hardly be required to provide "adequate protection" for an interest that is not entitled to first priority under the applicable bankruptcy law.

The Court therefore concludes that, in this case, turnover is not rendered unlawful by the absence of specific and adequate protection being provided by the bankruptcy court for BNY's security interest. BNY, having done business with a Bahamian corporation and subjected itself to Bahamian bankruptcy law, must pursue its claims in the Bahamian proceeding.

### II. TURNOVER MAY BE GRANTED REGARDLESS OF WHETHER BNY HAS A VALID SET–OFF RIGHT

The Court need not address whether any common law or contractual right of BNY's to set-off is preserved, because any set-off claim may be fully addressed by the Bahamian court. The Court notes that the bankruptcy code does not create a right of set-off—the right exists, if at all, under applicable non-bankruptcy law. *See, e.g., In re McLean Indus., Inc.,* 90 B.R. 614, 618 (Bankr. S.D.N.Y.1988). The applicable priorities in this action, including any right to set-off, will be decided under the relevant law by the Bahamian court. 11 U.S.C. § 553 does not mandate a contrary result.

This result is supported by the decision in *Culmer,* where the Court found that the Bahamian court should adjudicate the set-off issue. *See Culmer,* 25 B.R. at 633 n. 6. Bankruptcy Judge Lifland was dealing with a § 304 proceeding that involved Ba-

hamian liquidators seeking, *inter alia,* the turnover of funds held by two U.S. banks. *See id.* at 625, 633 n. 6. Judge Lifland concluded that the banks' rights to set-off "should properly be determined in the Bahamian liquidation." *Id.* at 633 n. 6. Judge Lifland did not order turnover in that case because the foreign liquidators had conceded that the funds subject to set-off could be exempt from the turnover order. *Id.* Here, however, in the context of a case where the foreign liquidators have requested turnover of funds subject to set-off, and the order of priorities with respect to the debtor's property will be properly addressed by a Bahamian proceeding meriting this Court's deference, this Court will grant turnover. Custody of the MIBL Accounts may remain in the hands of the Bahamian liquidators while the Bahamian court decides whether BNY is entitled to the funds in those accounts by reason of its set-off or other claims.

### CONCLUSION

For the foregoing reasons, the decision of the bankruptcy court is AFFIRMED.

SO ORDERED.