In the Matter of THORNHILL GLOBAL DEPOSIT FUND, LTD., Debtor.

Wayne Aranha and Ishmael Lightbourne, Official Liquidators of Thornhill Global Deposit Fund, Ltd.

v.

Eagle Fund, Limited, Mercurius Investment Holding, Limited, Verdant Investors Group, Ltd., and Boland Enterprises, Ltd., Defendants.

Bankruptcy No. 99–12558–CJK.

United States Bankruptcy Court, D. Massachusetts.

Feb. 1, 2000.

Daniel M. Glosband, Goodwin, Proctor & Hoar, Boston, MA, for Debtors.

S. Gordon, J. Nabors, for Mercurius.

J. Gilmore, for Hill & Barlow.

J. Kobe, for Eagle.

J. Rudman, for Verdant and Boland.

### MEMORANDUM OF DECISION ON MOTION AND CROSS–MOTION FOR SUMMARY JUDGMENT

CAROL J. KENNER, Bankruptcy Judge.

This proceeding presents a dispute between a high risk international investment fund and several of its investors.[1] It is an ancillary proceeding under section 304 of the Bankruptcy Code. Thornhill Global Deposit Funds, Ltd. ("Thornhill Global" or "Debtor") is a debtor in a compulsory winding-up proceeding in the Bahamas. Wayne Aranha and Ishmael Lightbourne are the Official Liquidators ("Official Liquidators") appointed by the Supreme Court of the Commonwealth of the Bahamas ("Bahamas Court"). On cross-motion for summary judgment, the Official Liquidators seek relief under section 304 of the Code[2] for the purpose of repatriating $3 million (the "Funds") presently held in the United States by Debtor's former counsel, Hill & Barlow, a Professional Corporation ("Hill & Barlow"). The Official Liqui-

---

1. This Memorandum Decision constitutes the Courts findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(c), as made applicable by F.R.Bankr.P. 7052 and 9014. Subject matter jurisdiction is predicated on 28 U.S.C. §§ 157(a) and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. The Bankruptcy Code is 11 U.S.C. § 101 et seq. (West, 1994). References to section numbers are references to sections in the Bankruptcy Code ("Code") unless otherwise indicated.

dators also seek a permanent injunction of all pending and future lawsuits filed in state court against the Debtor. The issue presented is whether the Debtor's transfer of $3 million into its attorney's client-fund account after a state court order required the Debtor to create an escrow itself created the escrow, and if so, whether the escrowed funds are property of the Debtor's foreign bankruptcy estate.

For the reasons stated more fully below, I allow the Liquidators' cross-motion for summary judgment. I hold that no escrow account was created under the facts of this case. The Funds are therefore property of Thornhill Global's foreign bankruptcy estate and should be administered by the Bahamas Court in the foreign insolvency proceeding. A separate order granting a permanent injunction as modified by the defendants' limited objection, and requiring turnover of the $3 million account, shall enter accordingly.

## BACKGROUND

### I. The Parties.

The following facts are not in dispute. Thornhill Global is an international fund management firm organized under the laws of the Commonwealth of the Bahamas.[3] Its principal assets are located in the Bahamas and in England. Thornhill Global was established in 1995 as an investment fund offering interest bearing-securities in emerging market economies. It sold its shares to a limited number of wealthy investors. In August and September of 1998, when Russia defaulted on its international debt obligations, Thornhill Global lost sixty-six percent of its value. Shortly thereafter, on February 24, 1999,

Thornhill Global filed for voluntary liquidation in the Bahamas. The voluntary petition was subsequently converted to a court supervised compulsory winding-up proceeding on March 29, 1999.

Mercurius Investment Holding, Limited ("Mercurius") is one of Thornhill Global's investors. It is an investment vehicle for its sole shareholder, Frans Claessen, and was organized under the laws of the British Virgin Islands with a principal place of business in the Isle of Guernsey. Mercurius maintains a lending relationship with KBW Wesselius Effectanbank, N.V. ("KBW"), a Dutch financial institution, pursuant to which KBW holds shares in Thornhill Global as Mercurius' nominee.

Eagle Fund, Limited ("Eagle"), Verdant Investors Group, Limited ("Verdant"), and Boland Enterprises, Limited ("Boland"), the other defendants in this case, are also investors of Thornhill Global. Verdant and Boland are organized under the laws of the British Virgin Islands and maintain a principle place of business in Gibraltar. Eagle is a Cayman Islands company and has its principle place of business in the Island of Grand Cayman.

### II. The State Court Proceedings.

After Thornhill Global lost sixty-six percent of its value in the wake of Russia's international default, Mercurius, Eagle, Boland and Verdant each filed suit in the trial court of Massachusetts. The investors sought damages for, *inter alia*, fraud, misrepresentation, breach of fiduciary duty and breach of contract based on allegedly false representations regarding the status of Thornhill Global's investment position in Russia.[4] Each investor success-

---

3. Thornhill Asset Management, Limited ("Thornhill Management") is Thornhill Global's investment advisor. It is organized under the laws of the Bahamas and is also the subject of an ancillary proceeding, but is not a party to this case.

4. Mercurius is the plaintiff in a case filed on December 30, 1998 in the Middlesex Superior Court of the Massachusetts Trial Department, Civil Action No. 98-6351 (the "Mercurius

Case"). Eagle is the plaintiff in a case filed on September 28, 1998 also in the Middlesex Superior Court of the Massachusetts Trial Department, Civil Action No. 98-04864 (the "Eagle Case"). Verdant and Boland are the plaintiffs in a case filed on February 19, 1999 also in the Middlesex Superior Court of the Massachusetts Trial Department, Civil Action No. 99-1110 (the "Verdant / Boland Case"). The defendants in all four cases include

fully obtained a preliminary injunction against Thornhill Global from the state court.[5] However, in compliance with an order by the Bahamas Court, Eagle, Boland and Verdant are not seeking to continue their state court actions at this time. The only suit at issue, therefore, is the one filed by Mercurius. Any further action in all of the suits was preliminarily enjoined by this Court's order entered April 22, 1999.

Mercurius commenced an action against Thornhill Global in Massachusetts state court on December 30, 1998. Superior Court Judge Hiller B. Zobel approved, as jointly submitted by the parties, the following order on January 11, 1999:

THAT, the Defendant Thornhill Global Deposit Funds Limited shall deposit into an escrow account within the United States jointly held by counsel for the Plaintiff, Peter J. Haley, and counsel for the Defendants, John A.D. Gilmore, (the "Account") the amount of three million dollars ($3,000,000.00 U.S.), in accordance with the terms and conditions of an escrow agreement between counsel, (or absent such agreement upon further order of the Court), until further order of this Court;

THAT, no disbursements shall be made from the Account, except as follows: Any amounts which would be distributed to KBW Wesselius Effectenbank ("KBW") from Thornhill Global Deposit Funds Limited shall be withdrawn from the Account and paid to KBW.

Following entry of this order, counsel for Mercurius and Thornhill Global began negotiating the terms of the escrow agreement. On February 2, 1999, Thornhill Global deposited U.S. $3 million into its attorney's client-fund account at State Street Bank in Boston.[6] During the rest of January and into March, the parties exchanged a series of telephonic and written communications regarding the details of an escrow agreement including the selection of a mutually acceptable escrow agent. At one point, both Chase Bank of Texas and State Street Bank and Trust Company were considered for this function. It is undisputed, however, that the parties never executed a formal escrow agreement. The parties never agreed on the terms of an escrow agreement; they never selected a mutually acceptable escrow agent; and they never funded an escrow account.

### III. The Bankruptcy Proceedings.

On February 24, 1999, Thornhill Global filed for liquidation in the Bahamas by filing Articles of Dissolution in accordance with Section 92 of the International Business Companies Act ("IBC"). Thornhill Global's former director, Jeffrey Beneby, was named as voluntary liquidator to wind up the affairs of the debtor.

On March 31, 1999, acting on petition of several of Thornhill Global's creditors, the Bahamas Court removed Mr. Beneby as the Debtor's liquidator, and appointed Wayne J. Aranha and Ishmael Lightbourne as Provisional Liquidators. Shortly thereafter, on April 8, 1999, the Bahamas Court ordered the compulsory winding-up of Thornhill Global pursuant to the Baha-

Thornhill Global, Thornhill Management, and two individuals, Karlis Sarkans and Jonathan Spring. Verdant and Boland also named as defendants Elizabeth Smith and Ernest Philip.

5. Eagle obtained an injunction on February 11, 1999 in the Eagle Case enjoining Thornhill Global from distributing any assets unless and until Thornhill Global first deposits $550,000 into an escrow account in the United States. Verdant and Boland also obtained

an injunction in their case, on March 2, 1999, directing Thornhill global to transfer $5 million into an escrow account in the United States. Thornhill Global alleges insufficient funds to comply with the order.

6. The funds were deposited into an insured money market account, number 9464–274–1, and designated as "Hill & Barlow Sub 432 for Thornhill Global Deposit Fund Ltd., One International Place, Boston, MA 02110."

mas Companies Act of 1992 ("Companies Act") and Winding–Up Rules, and appointed Mssrs. Aranha and Lightbourne as Official Liquidators. The Court directed the Official Liquidators to continue the compulsory liquidation of Thornhill Global under on-going supervision of the Bahamas Court.

On March 25, 1999, prior to the compulsory winding-up of the Debtor, Mr. Beneby, as voluntary liquidator, filed a section 304 petition in this Court. The Official Liquidators subsequently filed a motion to be substituted for Mr. Beneby which this Court allowed on April 22, 1999. On April 20, 1999, the Court held a hearing on the petition. On April 22, 1999, the Court entered an order (the "section 304 Order")[7] which preliminarily enjoined continuation of the state court litigation against Thornhill Global, including Mercurius' suit.[8]

7. In addition to granting a preliminary injunction, the section 304 Order included the following relevant findings: (1) that Eagle, Verdant and Boland had sought leave of the Bahamas Court to continue to prosecute their state court actions and that on April 19, 1999, the Bahamas Court denied their requests after hearing; (2) that Mercurius apparently believed itself not bound by the stay under Bahamas law and did not seek leave of the Bahamas Court to pursue the Mercurius Case; (3) that it is disputed whether an escrow agreement or further order in the Mercurius Case was entered and that the entire $3,000,000 is held by Hill & Barlow, a Professional Corporation in a client account in the name of Thornhill Global, subject to such dispute; (4) that the specific relevant facts and the issues of whether an escrow has been created and whether Thornhill Global or Mercurius has superior rights ... are issues that require judicial determination; and (5) that on the record available, the Court believes that there is a reasonable likelihood that the Official Liquidators will establish that the $3 million is an asset of Thornhill Global which should be administered by the Bahamas Court.

8. After entry of the section 304 Order, the Official Liquidators brought an application before the Bahamas Court seeking a determination that the $3 million in custody of Hill & Barlow was an asset of Thornhill Global and should be turned over to the winding-up pro-

On June 25, 1999, Mercurius filed a motion seeking relief from the preliminary injunction. In response, the Official Liquidators filed a motion and cross motion for summary judgment seeking a permanent injunction and turnover order. Because Mercurius' pleading was inappropriately characterized as a motion for relief from stay, the Court denied the motion on July 14, 1999, but only to the extent that Mercurius demanded relief under § 362(d).[9] The Court reserved judgment on Mercurius' demand for relief from the preliminary injunction pending full briefing of the pleadings. Both parties have submitted briefs in support of their motions, statements of undisputed facts pursuant to Fed. R.Bankr.P. 7056, supplemental pleadings, supporting documentation and affidavits.

## IV. Arguments.

Mercurius opposes the Liquidators' motion based on both the merits of the sec-

ceedings in the Bahamas. Mercurius was noticed of the hearing and appeared in the Bahamas Court represented by Brian M. Moree and Mr. Allen. Senior Justice Osadebay, of the Bahamas Court, found that the $3 million was an asset of Thornhill Global's estate and should be turned over to the Official Liquidators to be administered in the Bahamas proceeding. Justice Osadebay noted, however, that although he had jurisdiction over Mercurius and Thornhill Global, the parties before him, he lacked jurisdiction over Hill & Barlow and State Street Bank. He therefore could not enter an order requiring turnover of the funds because any such order would lack extra-territorial effect.

9. The filing of a section 304 petition does not commence a full bankruptcy case. Rather, a section 304 case is an ancillary case in which a United States bankruptcy court may apply its processes to give effect to orders entered abroad. *Goerg v. Parungao (In re Goerg)*, 844 F.2d 1562, 1568 (11th Cir.1988). The section 304 debtor therefore does not receive the benefits of a full bankruptcy administration under the Code. *Id.* Thus, for example, the debtor is not entitled to the automatic stay under § 362 or a discharge of its debts on completion of the section 304 proceeding. *Id.* at 1568. A motion for relief from stay is therefore inappropriate under this section.

tion 304 petition and on the allegation that summary judgment is premature because there remains outstanding a genuine issue of material fact as to the Debtor's ownership interest in the disputed Funds. Mercurius argues that the $3 million are in escrow which renders the Funds immune from turnover because they are no longer property of the Debtor's foreign bankruptcy estate. Furthermore, Mercurius argues that the issue of whether the $3 million are in escrow presents a question of fact not amenable to resolution on a motion for summary judgment. Finally, Mercurius submits that this Court should not enter a permanent injunction against pending and future state court lawsuits because doing so will fail to result in an efficient and expeditious administration of the Debtor's bankruptcy estate as required under section 304(c) of the Code. It filed a Motion for Limited Relief from Stay to allow it to seek determination from the state court as to whether an escrow account was established.

The other defendants—Eagle, Verdant and Boland—also oppose the Liquidator's motion but only to the extent necessary to enable future litigation in state court should a subsequent order of the Bahamian court so require. These defendants do not otherwise object to the Liquidators' request for a permanent injunction and turnover of the $3 million account.

In response, the Official Liquidators urge this Court to accept the finding of the Bahamas Court that no escrow was created based on principles of comity. Alternatively, they argue this Court should make its own findings that no escrow was created and that a turnover order and permanent injunction are within the scope of section 304 relief in this case.

### DISCUSSION

#### I. Introduction.

■ Section 304 of the Code allows the foreign representative of a foreign bankruptcy estate to marshal and repatriate assets in the U.S. to protect and facili-

tate the administration of the foreign proceeding. *See* 2 Lawrence P. King et al., Collier on Bankruptcy, p. 304.04[1] at 304.16 (rev. 15th ed. 1999) ("Collier"). Congress enacted the provision to prevent dismemberment of a foreign debtor by local creditors of assets located here. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 34 (1977); S.Rep. No. 05–989, 95th Cong., 2d Sess. 35 (1978), U.S.Code. Cong. & Admin.News., pp. 5787, 5821. Courts have interpreted the provision broadly, allowing the bankruptcy court to mold relief in near blank check fashion to enforce the Code's underlying equitable principles. *See e.g.*, *In re Treco*, 239 B.R. 36, 39 (S.D.N.Y. 1999); *Angulo v. Kedzep Ltd.*, 29 B.R. 417, 418–19 (S.D.Tex.1983); *In the Matter of Culmer, G.A.D.*, 25 B.R. 621, 624 (Bankr. S.D.N.Y.1982).

Section 304 authorizes the court to stay the commencement or continuation of any action in the United States against property involved in a foreign proceeding. 11 U.S.C. § 304(b)(1)(A); *Goerg v. Parungao (In re Goerg)*, 844 F.2d 1562, 1563–64 (11th Cir.1988). The court may also stay the enforcement of any lien or judgment obtained against such property, and may order that the property be turned over for administration by the foreign court in which the principal bankruptcy case is pending. 11 U.S.C. §§ 304(b)(1)(B), (b)(2); *In re Goerg*, 844 F.2d at 1564. Finally, the court may order other relief it deems appropriate at its discretion. 11 U.S.C. § 304(b)(3); *In re Goerg*, 844 F.2d. at 1568 (Congress intended that bankruptcy courts have "maximum flexibility" in crafting appropriate orders); *Angulo*, 29 B.R. at 419 (scope of section 304 sufficiently broad and flexible to allow ancillary suit filed solely for purpose of conducting discovery).

In determining whether to grant relief under this section, I must consider:

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceedings;

(3) prevention of preferential or fraudulent dispositions of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 304(c).

If I find that these factors militate .in favor of an economic and expeditious administration of the foreign estate, I may grant the ancillary relief requested. I must first determine, however, that the Official Liquidators are entitled to bring the section 304 petition and that venue in this Court is proper.

### (A) Venue.

■■■ The Official Liquidators properly filed their complaint in this Court because the $3 million account and the underlying state court litigation are in this district. Venue for cases arising under section 304 is prescribed by special statute and is contingent on the type of relief requested in the petition.[10] See 28 U.S.C. 1410. If the petitions seeks continuation of an action in a state or federal court, venue is proper only in the district where such action is pending. See 28 U.S.C. § 1410(a); In re Brierley, 145 B.R. 151, 162 (Bankr.

S.D.N.Y.1992). Similarly, if the parties require the turnover of property of a foreign debtor's estate, the action may be commenced only in the court for the district in which such property is found. See 28 U.S.C. § 1410(b).

The Official Liquidators brought this action to enjoin the continuation of litigation pending in the Massachusetts Superior Court. They also request a turnover of assets on deposit with State Street Bank and Trust Company of Boston. Venue therefore lies in this Court to enjoin the underlying state court actions and to order turnover of the funds located in this district. See 28 U.S.C. §§ 1410(a), (b).

### (B) Standing.

■■■ The Official Liquidators meet the additional prerequisites for relief as they have established a foreign proceeding against the debtor is pending and that they are "foreign representatives." Section 304(a) requires that an ancillary case is "commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative." 11 U.S.C. § 304(a). A foreign representative is "duly selected trustee, administrator, or other representative of an estate in a foreign proceeding." Id. at § 101(24). A foreign proceeding is further defined as a "proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an

---

10. The statute provides:
  (a) A case under section 304 of title 11 to enjoin the commencement or continuation of an action or proceeding in a State or Federal court, or the enforcement of a judgment, may be commenced only in the district court for the district where the State or Federal court sits in which is pending the action or proceeding against which the injunction is sought.
  (b) A case under section 304 of title 11 to enjoin the enforcement of a lien against a property, or to require the turnover of property of an estate, may be commenced only in the district court for the district in which such property is found.
  (c) A case under section 304 of title 11, other than a case specified in subsection (a) or (b) of this section, may be commenced only in the district court for the district in which is located the principal place of business in the United States, or the principal assets in the United States, of the estate that is the subject of such case.
  28 U.S.C. § 1410.

estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization." *Id.* at § 101(23).

The instant proceedings in the Bahamas are pursuant to the Bahamas International Business Companies Act of 1989 (No. 2 of 1990) (the "IBC Act"); sections 197 through 234 of the Companies Act of 1992 (the "Companies Act"); and the Companies (Winding–Up) Rules. The section 304 petition was initially filed by Mr. Beneby, who was then replaced by Mssrs. Aranha and Lightbourne, Thornhill Global's Official Liquidators appointed by the Bahamas Court. Sections 90 and 91 of the IBC Act, and section 212 of the Companies Act, delineate the powers of the Official Liquidators, which include bringing or defending any suit or action on behalf of the debtor; selling the real and personal property of the debtor; and doing all such other things as may be necessary for the winding up of the company's affairs and the distribution of its assets. These powers are analogous to those of a Chapter 7 trustee under our own Bankruptcy Code.

Bankruptcy courts have consistently recognized that the compulsory winding up under Bahamian law qualifies as a "foreign proceeding" and that similarly, the officially appointed liquidators qualify as "foreign representatives." *See e.g., In re Treco,* 239 B.R. at 41–42 (comparing Bahamas insolvency law to U.S.Code); *In re Hackett,* 184 B.R. 656, 659 (Bankr.S.D.N.Y. 1995); *Culmer,* 25 B.R. at 629–30. Based on the section 304 petition, as supported by the affidavits and relevant foreign statutes, this Court finds that the Thornhill Global insolvency before the Bahamas Court is a "foreign proceeding" and that the Official Liquidators are "foreign representatives." *See* 11 U.S.C. §§ 101(23); 101(24); 304(a). The Official Liquidators therefore satisfy the pre-requisites for ancillary relief.

## II. Threshold Determination of Ownership.

■ I may only order turnover of funds in which the Debtor has an ownership interest. *See* 11 U.S.C. § 304(b)(1)(B); *Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag),* 961 F.2d 341, 348 (2d Cir.1992). Mercurius claims that an escrow was created and that the $3 million account is not property of Thornhill Global's estate. Mercurius also asserts that the escrow issue presents a question of fact that can not be resolved on motion for summary judgement. Before addressing whether an escrow was created, therefore, the Court must determine whether the Official Liquidators meet the summary judgment standard.

### (A) Summary Judgment is Appropriate in this Case.

Summary judgment applies when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 and n. 3, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) *quoting* Fed.R.Civ.P. 56(c); Fed.R.Bank.P. 7056 and 9014 (makes Fed.R.Civ.P. 56 applicable to contested matters in bankruptcy proceedings). The moving party has the burden of demonstrating the absence of any genuine issue of material fact, but all inferences as to the underlying facts must be viewed in the light most favorable to the party opposing the motion. *S.E.C. v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). A party must set forth concrete particulars and can not rest on mere allegations or denials of an adverse party's pleading. Fed.R.Civ.P. 56; *Research Automation Corp.,* 585 F.2d at 33 (moving party must bring to the court's attention some affirmative indication that its version of relevant events is not simply an allegation lacking merit).

Under the summary judgment standard, there must be a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion. *See id.* A fact is "material" only if it will affect the outcome of a lawsuit under applicable law. *See id.; see also In re Treco,* 229 B.R. 280, 285 (Bankr.S.D.N.Y.1999) *aff'd* 239 B.R. 36 (S.D.N.Y.1999). Similarly, a dispute over a material fact is only "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the non-movant. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. In effect, the Court must determine whether the evidence presents sufficient disagreement that submission to a jury is required or if the evidence is so one-sided that one party must prevail as a matter of law. *See id.; see also Heyman v. Commerce & Indus. Insur. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975) ("on motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried"). The movant must establish that no issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Summary judgment is appropriate here. The facts themselves are not in dispute. Whether Judge Zobel's order and the subsequent transactions between Mercurius and Thornhill Global created an escrow, and if so, whether funds in escrow are property of a foreign debtor's bankruptcy estate, call for a legal determination predicated upon facts that are not themselves in dispute. *See In re Treco,* 229 B.R. at 286; *accord In re Bank of New England Corp.,* 161 B.R. 557, 558 (Bankr.D.Mass.1993) (summary judgment appropriate where only the legal significance and interpretation of undisputed facts are at issue). Neither Mercurius or the Official Liquidators contest the terms of Judge Zobel's order, an unlikely challenge given that the order was jointly submitted by the parties. What Mercurius seeks is an interpretation of the order, i.e., a legal determination.

Furthermore, the parties do not question the fact that after the state court entered its order, Thornhill Global transferred $3 million into its lawyer's client-funds account. The transactions following the initial transfer are similarly uncontested: both parties agree that phone calls and letters were exchanged, that the intent was to fund an escrow account, either with Chase Manhattan Bank or State Street Bank or some other mutually acceptable escrow agent, but that no such account was ever finalized or funded. The issue of whether these events nevertheless created an escrow under the express terms of Judge Zobel's order, or at state law, calls for a legal interpretation of undisputed facts. Summary judgment is therefore appropriate. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *see also Weiss v. Blue Cross/Blue Shield of Delaware,* 206 B.R. 622, 627–28 (1st Cir. BAP 1997) (summary judgment appropriate on determination of whether conduct in the form of three separate agreements entered into by the parties gives rise to estoppel where agreements, though not supported by admissible affidavits, were presented without objection).

**(B)  The $3 million Account is Property of the Debtor's Foreign Bankruptcy Estate Because No Escrow Account was Created.**

Under section 304, the foreign debtor's estate is defined by the law of the jurisdiction in which the foreign proceeding is pending. *See In re Koreag,* 961 F.2d at 348. Other applicable law defines the estate's interest in the particular property. *See id.* at 348–49. Stated differently, a court in an ancillary proceeding, must make an initial determination as to the ownership of the property claimed to belong to the foreign estate. *See id.; see also Kojima v. Grandote Int'l Ltd. Liability Co. (In re Grandote County Club Co., Ltd.),* 208 B.R. 218, 224 (D.Colo.1997); *In re Rubin,* 160 B.R. 269, 274 (Bankr. S.D.N.Y.1993); *In re Lines,* 81 B.R. 267, 271–72 (Bankr.S.D.N.Y.1988). The ques-

tion of ownership is determined by principles of local (i.e., non-bankruptcy) law. These in turn are mandated by an appropriate choice-of-law analysis.[11] Finally, the Court must decide whether the asset, based on the nature of the foreign debtor's ownership interest as just determined, is property of the foreign debtor's estate pursuant to the law of the foreign jurisdiction. *See In re Koreag*, 961 F.2d at 348–50.

The Official Liquidators urge this Court to rely on the ruling of the Bahamas Court that the $3 million account is property of the Debtor's estate. As discussed *infra*, comity affords an appropriate basis on which to accept the foreign decision in this case.[12] However, I will make my own ruling regarding the characterization of the disputed funds because the record is unclear on the extent to which the Bahamas Court considered Mercurius' legal arguments.[13]

█ No escrow account was created under the plain language of Judge Zobel's order. His order unambiguously requires Thornhill Global to deposit $3 million into an account "jointly held" by counsel for Thornhill Global *and* counsel for Mercurius. His order further requires that this joint account be in accordance with the terms and conditions of an escrow *agreement* between the parties. The parties exchanged two proposed forms of escrow agreement, one with Chase Bank of Manhattan and the other with State Street Bank of Boston. But Thornhill Global did not deposit the $3 million into either account nor was such an account ever created. Urged by Mercurius' counsel, the Debtor did transfer the money into an United States account. That account, however, was not one established pursuant to an escrow agreement between the parties nor was it an account jointly held by both Mercurius and the Debtor's counsel. Thornhill Global merely transferred the $3 million to its United States attorney.

The transfer alone does not establish that Thornhill Global complied with Judge Zobel's order. In fact, one can infer that the parties drafted the state court order in anticipation of their inability to agree. By including the parenthetical "or absent such agreement upon further order of the Court," the parties themselves contemplat-

11. A choice-of-law issue normally presents itself in the initial determination of ownership. *See In re Koreag*, 961 F.2d at 351 ("In the same way that the question is bifurcated under United States bankruptcy law—with state law defining property interests and federal law providing the scheme of distribution—the interests of the competing jurisdictions should be bifurcated in choice-of-law analysis"). As local law determines whether particular property is part of Thornhill Global's estate, the Court must decide which local law supplies the substantive rule. Federal courts sitting in diversity jurisdiction are required to apply the choice-of-law doctrines of the forum state. *See Klaxon v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Bankruptcy courts have interpreted *Klaxon* as imposing the forum state's choice-of-law rules on bankruptcy adjudications where the underlying rights and obligations are defined by state law. *See In re Koreag*, 961 F.2d at 350. The parties submitted arguments based on Massachusetts law, and have not provided reasons for applying any other law. Accordingly, the Court will determine the nature of Thornhill Global's ownership

interest in the $3 million based on Massachusetts law.

12. Comity arises in two contexts in this case: (1) I must decide whether to grant comity to the ruling by the Bahamas' Court; and (2) I must decide whether to grant comity as a function of the factors enumerated in section 304(c).

13. In his decision of June 18, 1999, Senior Justice Osadebay of the Bahamas Court concluded that the $3 million account is property of Thornhill Global's estate. Judge Osadebay reasoned that Hill & Barlow, the Debtor's U.S. counsel, received the $3 million as agent for the Debtor and that the parties therefor failed to establish an escrow account in accordance with the terms of the state court order. Judge Osadebay does not discuss, although he may have considered, Mercurius' alternative argument that an escrow was established at common law notwithstanding lack of formal compliance with Judge Zobel's order. The record before me is ambiguous regarding what facts Judge Osadebay had before him.

ed the possibility that they would be unable to reach an agreement on the terms of the escrow, i.e., that a further order by the state court might be necessary to compel transfer of the $3 million into an account over which Mercurius had sufficient rights so as to provide adequate security in the event Mercurius prevailed on its suit. Thornhill Global's transfer of $3 million to its United States attorneys does not satisfy Judge Zobel's order.

Moreover, Thornhill Global's transfer of the funds to its United States attorneys did not create an "escrow deposit" as a matter of Massachusetts law. In Massachusetts, the term "escrow" can be used with respect to written instruments as well as to deposits of money. *See Childs v. Harbor Lounge of Lynn, Inc.,* 357 Mass. 33, 35, 255 N.E.2d 606 (1970); *Kaarela v. Birkhead,* 33 Mass.App.Ct. 410, 412–13, 600 N.E.2d 608 (1992). The sparse Massachusetts case law thus defines a deposit in escrow to mean "to deliver it to a third party to be held until the performance of a condition or the happening of a certain event." *Childs,* 357 Mass. at 35, 255 N.E.2d 606. The third party escrow agent becomes the fiduciary of both the depositor and the grantee; she can not remain the agent of either in regards to the deposited funds. *See Birkhead,* 33 Mass.App.Ct. at 412–13, 600 N.E.2d 608. The escrow agent has a duty to keep the deposit and can not dispose of it except pursuant to the terms of the underlying agreement. *See id.*

Consistent with this definition, other states have defined an escrow more precisely to mean "a written instrument imparting a legal obligation, that one party to a transaction (i.e., a grantor, promisor, or obligor) deposits with a third party, the escrow agent, for the escrow agent to hold until the performance of a condition or occurrence of an event, and then to deliver to the other party to the transaction (i.e., grantee, promisee, or obligee)." *Johnson v. Exclusive Properties Unlimited,* 720 A.2d 568, 572 (Me.1998) *citing* Black's Law

Dictionary 641 (4th ed.1951). The creation of an escrow thus requires four elements: (1) an agreement regarding the subject matter and delivery of the deposit or instrument; (2) an escrow agent; (3) delivery of the funds or instrument to the agent, conditioned on the performance of an act or occurrence of an event; and (4) relinquishment of the funds by the grantor or depositor. *Id.*

In Massachusetts, the agreement regarding the escrow does not have to be a single written document. *See Birkhead,* 33 Mass.App.Ct. at 412–13, 600 N.E.2d 608. An escrow agreement can be inferred from a series of letters or transactions. *See id.* However, the agreement as memorialized by the transactions, must set forth the "performance of a condition or the happening of a certain event" pursuant to which the escrow agent, as fiduciary, may release the deposited funds. *Birkhead,* 33 Mass.App.Ct. at 412–13, 600 N.E.2d 608; *see Childs,* 357 Mass. at 35, 255 N.E.2d 606. Accordingly, in *Birkhead,* the Appellate Court of Massachusetts found an escrow was created only where a series of letters *unambiguously* established the terms of the escrow agreement *See Birkhead,* 33 Mass.App.Ct. at 412, 600 N.E.2d 608; *accord Childs,* 357 Mass. at 34, 255 N.E.2d 606 (contested agreement *specified* that buyer of real property had paid to seller a deposit and stated the terms under which the deposit could be released). The reason why the agreement must be clear is apparent: if the law is to impose a fiduciary duty on the third party escrow agent, the terms under which such duties can be discharged must be established.

The transactions between Mercurius and Thornhill Global do not establish the terms of an escrow arrangement. *Cf., Birkhead,* 33 Mass.App.Ct. at 412–13, 600 N.E.2d 608. In fact, they establish the opposite. The communications between the parties in this case—e.g., the exchange of draft escrow agreements, neither of which was

ever finalized, and Mercurius' correspondence seeking assurances that Thornhill Global will keep $3 million in its core account—emphatically prove the absence of an agreement. And absent an agreement, there can be no escrow.

This conclusion is consistent with the sequence of events in this case. Judge Zobel ordered the parties to fund a jointly-held escrow account with mutually acceptable terms. Thereafter, Thornhill Global transferred $3 million to its United States counsel. The parties then began negotiating the terms of the escrow. In other words, Thornhill Global did not transfer the $3 million *pursuant* to an agreement, but rather, in *anticipation of* reaching such agreement. Had the Debtor transferred the Funds pursuant to an agreement, then Mercurius' subsequent negotiations would have been superfluous because, as Mercurius argues, an escrow would have been created at the time Thornhill Global initially transferred the $3 million. (But clearly this was not the case. Thornhill Global transferred the Funds to its United States counsel, not to a third party fiduciary of the type contemplated by the state law definition of escrow agent). Nor was there any agreement that Hill & Barlow itself hold the funds as escrow agent. Mercurius had no interest or control over the disposition of those funds. This very lack of control compelled the continued negotiations and Mercurius' obvious anxiety regarding creation of the court-ordered escrow.

In sum, Thornhill Global's transfer of $3 million in contemplation of funding the court-ordered escrow did not create an "interim escrow" or common-law escrow because the transfer was not in accordance with an underlying agreement nor was it a transfer to a third party fiduciary. Thornhill Global and Mercurius were attempting to create and fund an escrow at some *future* point pursuant to the state court order. However, they never reached an agreement and no escrow deposit was created.

Having decided that the parties intended to—but failed—to create an escrow account, the Court holds that the $3 million account is still in possession and control of Thornhill Global.[14] Under the laws of the Bahamas, the account is therefore property of the foreign debtor's estate. *See* Companies Act § 211 (providing that liquidator takes custody or control of all property to which the company is or may be entitled); Companies Act. § 214 (Bahamas Court may direct that all or any part of property of whatsoever description belonging to company or held by trustees on its behalf vests in the official liquidator). Given that the pre-requisites for a turnover order under section 304 are met, the Court must now decide whether the ancillary relief requested by the Official Liquidators is otherwise warranted.

## III. The Merits of the section 304 Petition.

The determination of the appropriate ancillary relief depends on the collective degree to which the criteria of section 304(c) are satisfied. *See* 11 U.S.C. § 304(c); *In the Matter of Papeleras Reunidas, S.A.,* 92 B.R. 584, 590 (Bankr. E.D.N.Y.1988) *citing Drexel Burnham Lambert Group, Inc. v. Galadari,* 777 F.2d 877 (2d. Cir.1985). The Court must therefore examine what relief is consistent with the factors enumerated in section 304(c) to determine the extent of relief to which Thornhill Global is entitled.[15] *See In re Gercke,* 122 B.R. 621, 629 (Bankr.D.C. 1991).

---

14. Because the Court rules that no escrow was created, the Court does not need to address the more complex issue of whether the existence of an escrow deposit would have removed the account from the Debtor's bankruptcy estate.

15. Because Thornhill Global seeks to liquidate, the Court need not consider the final section 304(c) factor on reorganization. *See* 11 U.S.C. § 304(c)(6).

### (A) Just Treatment of All Holders of Claims Against or Interest in Such Estate.

Ordering turnover of the $3 million account is consistent with the just treatment of all holders of claims against or interests in the estate. The procedures of Bahamian insolvency law are comparable to the procedures of our own Bankruptcy Code. Under Bahamian law, once the winding-up process begins, any creditor—including Mercurius—may submit a claim and if it is disallowed, may submit it to the court for adjudication. *See* Companies (Winding–Up) Rules 60, 62. Creditors may also seek relief from the automatic stay under section 204 of the Companies Act to pursue litigation elsewhere. The discretion afforded under this section is similar to that exercised by United States courts under 11 U.S.C. § 362(d).

The Bahamas Court is in the best position to determine where and when claims against Thornhill Global should be adjudicated. The Debtor is organized under the laws of the Bahamas. It filed its insolvency petition in the Bahamas Court, the same court that approved the compulsory winding-up of the company and which has supervised the dissolution of the Debtor since that time. The Official Liquidators have been involved since March 31, 1999. Presumably, the numerous administrative provisions of the Companies Act and Winding–Up Rules have been triggered and are in operation. To allow Mercurius' litigation in the United States at this point would impede the continued, efficient administration of a consolidated bankruptcy estate. The Official Liquidators would have to engage in an expensive, overseas trial to the detriment of other claim-holders.

Mercurius' argument that it will lose a juridical advantage over the Official Liquidators because an injunction and turnover would vitiate any superior claim of right to the $3 million account merely confirms why the injunction and turnover should be granted. Congress enacted section 304 precisely to countervail the unfair advantages of quick moving creditors racing to the local courthouse steps. *See e.g., In the Matter of Axona Int'l Credit & Commerce, Ltd.,* 88 B.R. 597, 606 (Bankr.S.D.N.Y. 1988) (discussing legislative history) *aff'd* 115 B.R. 442 (S.D.N.Y.1990).

Similarly, contrary to Mercurius' claims, issuing the injunction and requiring Mercurius to litigate in the Bahamas Court is not prejudicial to its rights. Doing so merely places Mercurius in the same position as Thornhill Global's other creditors. Mercurius has been actively involved in the Bahamian proceeding since its inception. Mercurius' complaint asserts basic common law claims that the Bahamas Court is fully competent to adjudicate. Likewise, any allegations Mercurius has regarding allegedly unpaid year-end 1998 dividends, or conversely, that such payments were preferential payments by Thornhill Global to preferred creditors, are issues best resolved in the consolidated forum of the Bahamian proceedings.

### (B) Protection of Claim Holders in the United States Against Prejudice and Inconvenience in the Processing of Claims in Such Foreign Proceeding.

Mercurius argues that its rights under United States law are superior to the treatment it would receive under Bahamian law and that it will therefore be prejudiced and inconvenienced if forced to resolve its claims in the Bahamas. But the proper inquiry under this section is not whether Mercurius will enjoy superior rights here than in the Bahamas, but rather, whether *United States creditors* will be prejudiced if forced to proceed abroad. *Compare e.g., In the Matter of Toga Manufacturing Ltd.,* 28 B.R. 165, 170 (Bankr. E.D.Mich.1983) (widely criticized opinion in which court held that section 304 requires protection of United States citizens' claims against foreign judgments inconsistent with U.S. policies) *and Interpool, Ltd. v. Certain Freights of the M/V Venture*

*Star et al.*, 102 B.R. 373, 380 (D.N.J.1988) (court "does not intend to stand idly by while United States' citizens and creditors are harmed") *with In re Treco*, 239 B.R. at 41–42 (turnover of foreign debtor's funds on deposit in New York Bank granted).

Simply resolved, Mercurius is not a United States citizen or creditor nor does the need to protect such creditors exist.[16] What this case presents is a scenario in which two foreign multinationals are pursuing self-serving litigation strategies by choosing the forum most amenable to their claims. This case does not present a scenario in which an American creditor, lacking resources with which to proceed, is forced to pursue its claim in a foreign country in which it faces potential discrimination based on nationality. Mercurius is a sophisticated investor, organized under the laws of the Virgin Islands. It chose to invest in a fund organized under the laws of the Bahamas. The Court therefore finds no local interests in need of protection.

**(C) Prevention of Preferential or Fraudulent Dispositions of Property of the Estate and Distribution of Proceeds of Such Estate Substantially in Accordance with the Order under the U.S.Code.**

The insolvency laws of the Bahamas are substantially in accord with the Bankruptcy Code on the order of distribution of proceeds, claims processing, and prevention of preferential or fraudulent transfers. *See In re Treco*, 239 B.R. at 41–42; *In re Culmer*, 25 B.R. at 629–30. Unlike section 304(c)(1) of the Bankruptcy Code which addresses the treatment of claim holders, §§ 304(c)(3) and (c)(4) are concerned with dispositions of estate property outside of the actual bankruptcy proceedings. The subsections here require the Court to review the comparable provisions of the foreign law to assure that they are reasonably similar to our own. Allowing or disallowing continuation of Mercurius' state court litigation and ordering turnover of the Funds has no impact on whether the foreign legal system prevents preferential or fraudulent transfers or distribution of estate assets. *Cf., In re Gercke*, 122 B.R. at 630. For the reasons discussed more fully below, the Court holds that the Bahamian proceedings meet the §§ 304(c)(3) and (c)(4) requirements.

**(D) Comity.**

Comity features prominently in cross-border insolvency cases.[17] *See e.g., In re Treco*, 239 B.R. at 41; *In re Ionica, PLC*, 241 B.R. 829, at 835 n. 12 (Bankr.S.D.N.Y.1999). It is a doctrine that encourages deference to foreign laws and judgments. The prevailing modern

**16.** Section 304 is infused with an inherent tension between the desire to protect local interests—a "territoriality" approach—and the increasingly urgent need to grant deference to foreign proceedings for the purpose of promoting efficiency in international bankruptcies—the "universality" approach. *See e.g., In re Treco*, 239 B.R. at 40. Courts using the universality approach favor a single, unified distribution of the debtor's assets from one central forum. The courts defer to a single jurisdiction which retains the primary duty to resolve the debtor's financial difficulties and coordinates the actions in other jurisdictions in aid of the centralized proceeding. In contrast, courts relying on a territoriality approach emphasize the rights of local creditors and follow the strict rule of sovereignty. Under a strict application of this theory, each nation conducts its own bankruptcy proceeding with respect to the assets located within its jurisdiction and disregards any parallel proceedings in foreign jurisdictions. *See In re Hourani*, 180 B.R. 58, 64 n. 9 (Bankr. S.D.N.Y.1995) *citing* Lawrence J. Westbrook, *Choice of Avoidance Law in Global Insolvencies*, 17 Brook. J.Int'l L. 499 (1991). This Court condones the emerging trend in U.S. courts favoring the universality approach.

**17.** As suggested by the Honorable Burton R. Lifland, comity is the central theme of section 304. Its placement as but one factor on a list of factors usually cited to define the concept blurs the centrality of the doctrine. *See* Hon. Burton R. Lifland, Suggestions for the National Bankruptcy Review Comm'n and Congress, 4 AM.BANKR.INST.L.REV. 530, 530 (1996).

view is that an expansive view of comity is compelled by the rapidly developing global economy. *See e.g., In re Treco,* 239 B.R. at 41.

Comity has historically been defined as "[t]he recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Courts generally afford comity to the decisions of foreign courts so long as the foreign court is of competent jurisdiction and according comity does not prejudice the rights of U.S. citizens or violate domestic foreign policy. *See Guyot,* 159 U.S. at 202–03, 16 S.Ct. 139; *Banca Emiliana v. Farinacci (In re Enercons Virginia, Inc.),* 812 F.2d 1469, 1473 (4th Cir.1987); *see also In re Rubin,* 160 B.R. at 283; *In re Brierley,* 145 B.R. at 163–64; *In re Gercke,* 122 B.R. at 631; *In re Culmer,* 25 B.R. at 628–29.

Comity is not an imperative or directive, although it does rise above mere courtesy or accommodation. *See In re Rubin,* 160 B.R. at 283. "Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws." *Id.* Comity is withheld only if according comity is contrary or prejudicial to the interests of the nation called upon to extend its effects. *See id. citing Cunard S.S. Co. v. Salen Reefer Services, A.B.,* 773 F.2d 452, 457 (2d Cir.1985). Where the foreign laws are of a sister common law jurisdiction with legal systems and general notions of justice similar to ours, as is the case here, I find no reason why comity should not be extended to the Bahamian liquidation proceedings. *See In re Petition of G.C.K. Tam,* 170 B.R. 838, 845–46 (Bankr.S.D.N.Y.1994) (courts have consistently held laws derived from the British Companies Act provide substantially same

protection as U.S.Code and therefore support claim for relief under section 304).

This Court agrees with the analysis set forth by Judge Lifland and Judge Brozman of the Southern District of New York. *See In re Treco,* 239 B.R. at 41; *In re Culmer,* 25 B.R. at 629–30. The provisions of Bahamian law related to liquidation proceedings are in substantial conformity with our own Bankruptcy Code. They provide a comprehensive procedure for the orderly and equitable distribution of Thornhill Global's assets among all of its creditors. Some of the similarities include, as discussed in more detail by the *Culmer* court: (1) supervision by the Bahamas Supreme Court; *see* Companies Act § 197; Winding–Up Rules 88, 89; (2) appointed liquidators with a duty to report to the court and creditors at least twice a year, and a mandatory accounting at the end of their stewardship; *see id.;* (3) preliminary injunctive-type relief akin to the automatic stay under section 362 of the U.S.Code designed to prevent creditors from suing the debtor absent prior consent from the court; *see* Companies Act § 204; *c.f.,* 11 U.S.C. § 362; (4) the avoidance of preferential and fraudulent transfers; *see* Companies Act, §§ 271, 272; *c.f.,* 11 U.S.C. §§ 547, 548; (5) no payment to individual creditors or to any class of creditors without prior court approval; *see* Companies Act § 260; (6) no deferential or biased treatment of local creditors; and (7) a distribution scheme that is in substantial harmony with the order and priorities prescribed by our own bankruptcy code. *See generally In re Culmer,* 25 B.R. at 630 (detailed comparison of U.S. and Bahamian insolvency law); *see also In re Treco,* 229 B.R. at 294 (court found that although Bahamian law not identical in application to American law "there is nothing inherently vicious, wicked, immoral or shocking to the prevailing American moral sense ... [and] Bahamian laws are not repugnant to our ideas of justice") *aff'd* 239 B.R. 36 (S.D.N.Y.1999).

Based on this analysis, and the review of the Bahamian liquidation laws and expert affidavits submitted by the parties, the Court concludes that affording comity does not violate United States law or public policy. The Bahamian laws are in many ways similar to our own, and the Court so finds them. *Accord In the Matter of Axona,* 88 B.R. at 610 (exceptions to the doctrine of comity narrowly construed especially where foreign proceeding is in sister common law jurisdiction with procedures akin to our own); *In re Enercons Virginia, Inc.,* 812 F.2d at 1473 (Italian proceedings sufficiently analogous to United States concepts of justice as to warrant extension of comity); *In re Petition of J.S. Ward,* 201 B.R. 357, 362 (Bankr.S.D.N.Y. 1996) (comity granted to Zambian insolvency proceeding).

### Conclusion

Based on the foregoing, the Liquidator's requested relief is granted in part. The section 304 petition is granted. Mercurius, Eagle, Verdant and Boland are enjoined from the commencement or continuation of all further actions in a United States jurisdiction against Thornhill Global except to the extent that those actions are required by an order of the Bahamas Court supervising the Debtor's winding-up proceeding. The request for turnover of the $3 million account to the Official Liquidators is granted.